## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | |
| | : | **Chapter 7** |
| **ATOMICA DESIGN GROUP, INC.,** | : | |
| | : | |
| **DEBTOR** | : | |
| _____ | : | **Case No. 12-17235-AMC** |
| | : | |
| **BONNIE FINKEL, AS CHAPTER 7** | : | |
| **TRUSTEE OF THE ESTATE OF** | : | |
| **ATOMICA DESIGN GROUP, INC.,** | : | |
| | : | |
| **PLAINTIFF** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **WEVEEL LLC; JUNTO CREATIVE** | : | |
| **LLC; JOSEPH DIPALMA; TIZIANO** | : | |
| **RECCHIA; JASON LANE; IYA** | : | |
| **TECHNOLOGIES, LLC; AND** | : | |
| **LAROSE INDUSTRIES, LLC, D/B/A** | : | |
| **CRA-Z-ART.** | : | |
| | : | |
| **DEFENDANTS** | : | |
| _____ | : | **Adv. Proc. No. 14-00333-AMC** |

Ashely M. Chan, United States Bankruptcy Judge

## **OPINION**

## TABLE OF CONTENTS

I.      Introduction ................................................................................................... 1
II.     Facts and Procedural History .......................................................................... 2
        A.      The Debtor ........................................................................................... 2
        B.      The Chesapeake Bank Factoring Agreement ........................................ 3
        C.      So Real Brands, LLC ............................................................................ 4
        D.      The Debtor's Assets .............................................................................. 5
        E.      The Chesapeake and Federal Investigations .......................................... 7
        F.      DiPalma and Recchia's Bankruptcies ................................................... 8
        G.      WeVeel and Junto ................................................................................. 9
        H.      Cra-Z-Art and IYA ............................................................................. 11
        I.      The Debtor's Bankruptcy .................................................................... 13
        J.      The Trustee's Adversary Proceeding ................................................... 13
III.    Discussion .................................................................................................... 15
        A.      Pleading Standards .............................................................................. 15
        B.      Count I: The Racketeering Influenced and Corrupt Organizations Act Claims
                Against All Defendants ........................................................................ 22
                1.      Standing .................................................................................... 23
                2.      Section 1962(a) ......................................................................... 24
                3.      Section 1962(c) ......................................................................... 24
                4.      Section 1962(d) ......................................................................... 27
                5.      The Parties' Arguments ............................................................. 27
                6.      Analysis ..................................................................................... 32
        C.      Count II: Fraudulent Transfer Claims Against DiPalma and Recchia ............... 38
                1.      The Actual Intent Standard ........................................................ 41
                2.      The Constructive Fraud Standards ............................................. 47
        D.      Count III: Conversion Claims Against DiPalma and Recchia ............................ 51
        E.      Counts IV–V: Fraudulent Transfer Claims Against WeVeel and Junto ............... 55
        F.      Counts VI–VII: Veil Piercing Claims Under the Single Entity Theory .............. 61
        G.      Count VIII: Unjust Enrichment Claims Against All Defendants ........................ 66
                1.      The Joint Defendants ................................................................. 68
                2.      Cra-Z-Art ................................................................................. 72
IV.     Conclusion ................................................................................................... 76

## I.    INTRODUCTION

Bonnie Finkel, the Chapter 7 trustee ("Trustee") in the underlying bankruptcy estate of

Atomica Design Group, Inc. ("Debtor"), filed this adversary proceeding against the Debtor's

former officers, two of the Debtor's former customers, and other third parties. In the amended

complaint ("Amended Complaint"), the Trustee raised various causes of action including claims

under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (2016)

("RICO"), as well as state law claims for the avoidance of fraudulent transfers, conversion,

piercing the corporate veil, and unjust enrichment. All of the defendants, except for one, filed

motions to dismiss the counts pending against them in the Amended Complaint based upon the

Trustee's alleged failure to set forth plausible claims and each raised the affirmative defense of

*in pari delicto* in connection with some of those claims.

As discussed below, the Court will dismiss the RICO claims against these defendants

because the Trustee has failed to satisfy the "standing requirement" under § 1964(c) with respect

to the nexus between the alleged RICO violations and the resulting injuries sustained by the

Debtor. The Court also concludes that the Trustee has failed to set forth plausible claims related

to veil piercing because there was never an identity of ownership between the Debtor and the

various third party defendants.

Finally, the Court holds that the Trustee has set forth plausible claims in connection with

all of the state fraudulent transfer causes of action as well as conversion. With regard to the

unjust enrichment claims, the Court concludes that the Trustee has set forth plausible claims

against the Debtor's former officers and various third parties and that the affirmative defense of

*in pari delicto* is not applicable at this stage of the proceedings. However, with regard to the

unjust enrichment claim against one of the Debtor's former customers, the Court concludes that

the Trustee has failed to set forth a plausible claim against that entity because a contract existed

between them which governed their relationship, and the transfer of services and products to that customer was not unjust since the Trustee herself concedes that the customer paid fair market value for those services and products.

## II.    FACTS AND PROCEDURAL HISTORY

The Debtor is a Pennsylvania corporation. Am. Compl. ¶ 5, ECF No. 49. On July 31, 2012, three of the Debtor's creditors filed an involuntary chapter 7 bankruptcy petition against it and the Court entered an order for relief on September 20, 2012. *Id.* ¶¶ 6–7. The Trustee was appointed as the interim chapter 7 trustee of the Debtor's estate on October 15, 2012 and became the permanent trustee on November 29, 2012. *Id.* ¶ 8.

The Trustee initiated this adversary proceeding on behalf of the Debtor by filing a complaint against Joseph DiPalma; Tiziano Recchia; Jason Lane; WeVeel, LLC; Junto Creative LLC; and LaRose Industries, LLC d/b/a Cra-Z-Art (collectively "Defendants")[1] on July 29, 2014 ("Complaint"). Ultimately, the Court dismissed the Complaint without prejudice and the Trustee filed the Amended Complaint against the Defendants and IYA Technologies, LLC on June 15, 2015.[2] The Amended Complaint raises eight counts, including causes of action under RICO; the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Stat. and Cons. Stat. Ann. §§ 5101–10 (West 2016) ("PUFTA"); and for conversion, piercing the corporate veil, and unjust enrichment. The facts, as set forth in the Amended Complaint, are summarized below.

### A.    The Debtor

---

[1] Joseph DiPalma ("DiPalma") and Tiziano Recchia ("Recchia") are Pennsylvania citizens and comprise two of the three members of the Debtor's board of directors. Am. Compl. ¶¶ 9, 17, 19. Jason Lane ("Lane") is a Texas citizen. *Id.* ¶ 21. WeVeel, LLC ("WeVeel") is a Texas corporation and maintains its principal place of business in Pennsylvania. *Id.* ¶ 11. Junto Creative LLC ("Junto") is a Pennsylvania limited liability company and maintains its principal place of business in Pennsylvania. *Id.* ¶ 14. LaRose Industries, LLC d/b/a Cra-Z-Art ("Cra-Z-Art") is a New Jersey limited liability company and maintains its principal place of business in New Jersey. *Id.* ¶ 25.

[2] IYA Technologies, LLC ("IYA") is an Ohio limited liability company and maintains its principal place of business in Ohio. Am. Compl. ¶ 23.

DiPalma and Recchia first met at the Art Institute in Philadelphia where DiPalma instructed a graphic design course in which Recchia enrolled. Am. Compl. ¶ 33. Together, they formed the Debtor as a boutique graphic design firm that developed brand packaging for food, beverage, candy, publishing, and toy companies in or about April 2000. *Id.* ¶ 32.

DiPalma served as the Debtor's President and Chief Executive Officer and Recchia served as its Vice President. *Id.* ¶ 34. DiPalma and Recchia hired Bernard Stromberg ("Stromberg") as the Debtor's Business Manager in or about October 2006 and promoted him to Chief Financial Officer ("CFO") shortly thereafter. *Id.* ¶ 35. DiPalma, Recchia, and Stromberg comprised the Debtor's board of directors and owned 60%, 20%, and 20% of the shares of the Debtor, respectively. *Id.* ¶¶ 36–37. DiPalma's mother, Diane Scalera ("Scalera"), served as the Debtor's Business Manager throughout the events described in the Amended Complaint. *Id.* ¶ 42.

**B.    The Chesapeake Bank Factoring Agreement**

In July 2007, the Debtor entered into a cash flow or factoring agreement ("Factoring Agreement" or "Agreement") with Chesapeake Bank ("Chesapeake"). *Id.* ¶ 38. Chesapeake is a Virginia corporation and maintains its principal place of business in Virginia. *Id.* ¶ 39. Pursuant to the Factoring Agreement, Chesapeake initially extended a $500,000 line of credit to the Debtor and then increased it to $700,000 on April 25, 2008. *Id.* ¶¶ 38, 41. In return, the Debtor discounted, sold, and assigned to Chesapeake its right, title and interest in invoices that it billed to its customers "up to the full amount" of its line of credit. *Id.* ¶ 38.

As part of the Factoring Agreement, DiPalma and Recchia represented that the invoices that the Debtor sold to Chesapeake "were true and real debts owed to [the Debtor] for goods and services actually provided." *Id.* DiPalma signed the Factoring Agreement "in his corporate capacity as President of [the Debtor], and separately in the capacity of Guarantor." *Id.* ¶ 40. He

- 3 -

also "worked closely" with and "instruct[ed]" Scalera with respect to her duties relative to the

Factoring Agreement, for example drafting, reviewing, and sending customer invoices to

Chesapeake. *Id.* ¶ 42. Recchia also signed the Factoring Agreement as a Guarantor. *Id.* ¶ 40.

In February 2009, despite their contrary assurances, DiPalma and Recchia began selling

fabricated invoices to Chesapeake under the Agreement. *Id.* ¶ 57. Scalera and Stromberg were

also involved in the fraud. *Id.* ¶ 59. DiPalma and Recchia continued to sell fabricated invoices to

Chesapeake until November 2009, by which time they had fabricated and sold at least 160

invoices. *Id.* ¶ 57.

### C.    So Real Brands, LLC

At its inception, the only services that the Debtor performed for its customers were

graphic design services. *Id.* ¶ 43. Then, in early 2009, DiPalma and Recchia decided to expand

the Debtor's business into "the design, production and sale of children's toys and crafts." *Id.* As

a result, they created a toy and craft division within the Debtor. *Id.* ¶ 48.

Ultimately, through the Debtor, DiPalma and Recchia formed a wholly owned subsidiary,

So Real Brands, LLC ("SRB"), in June 2009. *Id.* SRB was a front through which the Debtor

conducted its toy and craft division. *Id.* DiPalma and Recchia told the Debtor's employees that it

operated the toy and craft division through SRB because the Debtor's graphic design customers

might stop employing the Debtor if they learned that it operated a competing business. *Id.* ¶ 47.

To further hide the toy and craft division from the Debtor's graphic design customers,

SRB operated under the name of Joseph Cullen ("Cullen"), a creditor of the Debtor. *Id.* ¶ 50.

DiPalma and Recchia represented to Cullen that he would become President and sole shareholder

of SRB in a series of communications from June to December 2009. *Id.* ¶ 50(a). These

concessions to Cullen were intended to satisfy a portion of the debt that the Debtor owed to

- 4 -

Cullen. *Id.* However, despite the concessions, DiPalma and Recchia controlled and operated

SRB, not Cullen. *Id.* ¶ 50(b).

SRB and Cullen were used to disguise the Debtor's toy and craft division from June to

December 2009. *Id.* ¶ 50(c). Throughout this period, SRB owned no assets and had no

employees—it was a shell. *Id.* ¶ 51. Instead, the Debtor handled all of SRB's operations and

transactions. *Id.* The Debtor financed SRB's operations with funds obtained from the Debtor's

graphic design division and borrowed from the Debtor's creditors such as Chesapeake Bank and

Cullen. *Id.* ¶ 52. Such operations included hiring and paying artists, designers, and other

employees and officers of the Debtor to carry out and build the toy and craft division's business.

*Id.* Simultaneously, DiPalma and Recchia transmitted various communications to the Debtor's

creditors, who were ignorant of SRB and the Debtor's toy and craft division, relating to the

strength and solvency of its graphic design division. *Id.* ¶ 53.

DiPalma and Recchia's efforts to grow the Debtor's toy and craft division were

successful. Through "great expense," the Debtor fostered relationships with manufacturers and

entered into agreements with large, national retailers to sell its products. *Id.* ¶ 62. By the fall of

2009, the Debtor had developed multiple toy and craft product lines which SRB had begun

selling to retailers such as Five Below and Hobby Lobby. *Id.* ¶ 63. As a result, SRB was a direct

competitor of many of the Debtor's largest graphic design clients. *Id.* ¶ 64.

**D.    The Debtor's Assets**

In November 2009, DiPalma and Recchia allegedly began to "divert, convert and steal

[the Debtor's] assets." *Id.* ¶ 67. Those assets allegedly included the Debtor's intellectual

property, inventory, accounts receivables, retail and manufacturing contracts, works-in-progress,

product designs, models, drawings, servers, computers, computer files, financial records,

production records, commercial printing equipment, advertising materials, business leads, and

- 5 -

information about the Debtor's business relationships (collectively "Assets"). *Id.* ¶ 68(a). These properties "constituted substantially all of [the Debtor's] assets." *Id.* ¶ 70(c). DiPalma and Recchia allegedly hired an accountant to erase any record of the Assets from the Debtor's accounting books. *See id.* ¶ 113 (stating that the accountant "revised many of the entries so as to falsely understate [the Debtor's] assets, overstate [its] liabilities and otherwise modify the entries to be intentionally vague, incomplete and misleading").

DiPalma, Recchia, Scalera, and other "conspirators" transported the Assets from the Debtor's offices in Morrisville, Pennsylvania to various hiding places, including DiPalma's house. *Id.* ¶ 68(b). DiPalma explained these and other details of the "effort to transition from [the Debtor] thru bankruptcy to SRB" in an email that he sent to Cullen. *Id.* Ex. B. Although "DiPalma and Recchia attempted to enlist Cullen" in the alleged fraudulent scheme, "Cullen demanded repayment of the sums he had loaned [the Debtor]" when he learned about the fraud and the sham role that they had created for him at SRB. *Id.* ¶ 66. When DiPalma and Recchia refused to repay Cullen's loans, Cullen disassociated from them. *Id.*

The transfer and/or conversion of the Debtor's Assets forced the Debtor to discontinue its operations. *Id.* ¶ 68(c). As a result, the Debtor ceased paying its debts to Chesapeake and to its other creditors in November 2009 and defaulted on approximately $2 million in financial obligations to its creditors in December 2009. *Id.* ¶¶ 65, 73. Since then and continuing to the present, the sum of the Debtor's debts has been greater than the sum of its assets. *Id.* ¶ 72.

In addition, DiPalma and Recchia continued to transmit various communications to the Debtor's creditors to conceal its toy and craft division and to convince them that the Debtor (1) had no assets, (2) would cease operations, and (3) would make payments on its debts to the creditors when it collected incoming accounts receivables. *Id.* ¶¶ 65, 68(h).

### E.    The Chesapeake and Federal Investigations

In December 2009, Chesapeake discovered and began investigating the fabricated invoices that it had purchased from the Debtor pursuant to the Factoring Agreement. *Id.* ¶ 125. Throughout its investigation, Chesapeake solicited oral and written statements from the Debtor's officers, directors, and employees. *Id.*

According to the Trustee, during a teleconference with a Chesapeake attorney on December 10, 2009, DiPalma, Recchia, and Scalera "falsely and fraudulently" identified Stromberg as solely responsible for the fabricated invoices. *Id.* ¶ 127. The Trustee also claims that DiPalma and Recchia "falsely and fraudulently" denied possessing or controlling the Debtor's Assets during the same teleconference. *Id.* DiPalma allegedly reaffirmed these and other lies in an email that he sent to Chesapeake and one of its attorneys on January 13, 2010. *See id.* ¶ 128 (summarizing the email in which DiPalma falsely denied directing the Debtor's "day-to-day affairs," Stromberg's performance as CFO, and the falsification of the Debtor's accounting records and falsely attributed the transfer and/or conversion of the Debtor's Assets to "Cullen and others").

As a result of DiPalma, Recchia, and Scalera's "cover-up," the Trustee alleges that (1) Chesapeake wrongly refrained from pursuing DiPalma, Recchia, and Scalera to recover the funds that they obtained in return for the fabricated invoices; and (2) they concealed from the Debtor and its creditors that they had transferred and/or converted the Debtor's Assets. *Id.* ¶ 129. Chesapeake forwarded the results of its investigation to the Office of the United States Attorney for the Eastern District of Virginia ("U.S. Attorney"). *Id.* ¶ 131.

Although the U.S. Attorney initiated a criminal investigation of the Debtor in response to Chesapeake's communication, DiPalma, Recchia, and Scalera again shifted the blame to Stromberg. *Id.* ¶¶ 131, 135. According to the Trustee, in various telephone conversations with

- 7 -

the U.S. Attorney, DiPalma, Recchia, and Scalera repeated many of the lies that they told to

Chesapeake's attorney. *See id.* ¶ 134 (indicating that such lies pertained to Stromberg's

responsibility for the fabricated invoices and DiPalma and Recchia's possession and control of

the Debtor's Assets). Furthermore, they allegedly "caus[ed] the U.S. Attorney to mistakenly

conclude that [they] had no involvement in the . . . [f]raud." *Id.* ¶ 135. As a result, only

Stromberg faced charges for crimes stemming from the Debtor's conduct pursuant to the

Factoring Agreement. *Id.* ¶¶ 136–37. Stromberg was charged with, and convicted under a plea

agreement for, one count of bank and wire fraud in violation of 18 U.S.C. §§ 1349, 1341, and

1343. Am. Compl. ¶ 136.

F.     **DiPalma and Recchia's Bankruptcies**

On February 23, 2010, DiPalma and Recchia filed individual chapter 7 bankruptcy

petitions that omitted any reference to the Debtor's Assets. *Id.* ¶¶ 114–15. Specifically, the

Trustee alleges that each petition was deficient in that it failed to disclose that DiPalma and

Recchia:

> (1) had taken possession of the Debtor's Assets in Schedule B;
>
> (2) were continuing to earn regular income from the Debtor's Assets in Schedule I;
>
> (3) had transferred the Assets to themselves within the two months preceding the filing of their petitions in the Statement of Financial Affairs; and
>
> (4) owed unsecured debts to the Debtor, which possessed legal claims against them for conversion, fraudulent transfers, and unjust enrichment, in Schedule F.

*Id.* ¶¶ 116–17. DiPalma and Recchia therefore allegedly committed perjury when they made

"oaths, declarations, certificates, verifications and statements" that their Schedules and

Statements of Financial Affairs were true and accurate. *Id.* ¶ 118. They also allegedly concealed

from the Court and the chapter 7 trustee that they possessed, derived income from, and, as

explained in the next section, eventually transferred, the Debtor's Assets. *Id.* ¶¶ 119–20.

- 8 -

According to the Trustee, DiPalma and Recchia's individual bankruptcies were wrongfully declared to be "No Asset Case[s]" as a result of the frauds listed above. *Id.* ¶ 122. Judge Magdeline D. Coleman discharged their personal debts in August 2010. *Id.* ¶ 123.

### G.   WeVeel and Junto

By February 2010, two months after DiPalma and Recchia transferred and/or converted the Debtor's Assets, they "realized that they needed a more practical business strategy" to use the Assets. *See id.* ¶ 74 (explaining that DiPalma and Recchia were unable to use the Assets because Cullen was still listed as SRB's sole owner and had disassociated from them). Accordingly, DiPalma attended a toy fair in New York where he encountered Lane, who owned L3 Sales and Sourcing, Inc., a manufacturing company that previously negotiated with the Debtor to form a joint venture. *Id.* ¶ 75.

DiPalma then recruited Lane to associate with him and Recchia to operate a toy and craft manufacturing business with the Assets. *Id.* ¶ 76. Lane had recently formed and was the sole member of WeVeel. *Id.* DiPalma wanted to use WeVeel as a "front" that would use the Debtor's Assets to operate its former toy and craft division. *Id.* ¶ 78. Likewise, Lane wanted to "produce, manufacture and sell crafts and toys," but needed the "intellectual property [and] business plan" that DiPalma and Recchia transferred and/or converted from the Debtor. *Id.* ¶ 76. Simultaneously, DiPalma recruited Michael Pecci ("Pecci") as another "public face" through which DiPalma and Recchia could use the Debtor's Assets.[3] *See id.* ¶ 79.

In April 2010, Lane transferred to DiPalma, Recchia, Pecci, and others, including Joel Chiapelli ("Chiapelli"),[4] membership interests in WeVeel and in exchange DiPalma and Recchia

---

[3] Pecci has "extensive experience working in the toy industry." Am. Compl. ¶ 79.

[4] Chiapelli is a graphic designer formerly employed by the Debtor, although not in the capacity of an owner, director, or officer. Am. Compl. ¶¶ 91, 93.

transferred to WeVeel all of the Debtor's toy and craft division related Assets. *Id.* ¶¶ 82, 100.

Such assets were allegedly transported from Pennsylvania to Lane's offices in Texas by WeVeel

and included the Debtor's "intellectual property, computer files, drawings, product designs and

works-in-progress." *Id.* ¶ 98. Around the same time, they conducted a "multi-day meeting" to

discuss which of the Debtor's intellectual properties they intended to manufacture and sell

through WeVeel. *Id.* ¶ 81. Based on a February 2011 email from a former employee of the

Debtor to Cullen, "almost all" of WeVeel's early product lines were in fact derived from projects

formerly belonging to the Debtor. *Id.* Ex. C; *see also id.* Ex. D (identifying a number of these

derivative products sold by WeVeel).

The Trustee alleges that WeVeel has "falsely and fraudulently" misrepresented itself as

headquartered in Texas through a website it has published and maintained since the spring of

2010. *Id.* ¶ 103. According to the Trustee, WeVeel's principal place of business is actually the

Debtor's former offices in Morrisville, Pennsylvania, although she admits that WeVeel "operates

a satellite office in Fort Worth, Texas." *See id.* ¶ 101 (stating that "WeVeel's books and records

are stored at," and that "DiPalma, Recchia, Chiapelli and Pecci work out of, coordinate and

operate [WeVeel's] business affairs . . . from," the Debtor's former offices in Morrisville).

The Trustee further alleges that WeVeel has misrepresented its ownership, membership,

and product line. First, she alleges that the aforementioned website "hides that DiPalma and

Recchia own a membership interest in and are officers of WeVeel . . . [and] that it is selling

products stolen from [the Debtor]." *Id.* ¶ 103. Second, she alleges that DiPalma, Recchia, Lane,

Pecci, Chiapelli, and WeVeel formed fraudulent shell companies and published additional

websites and otherwise advertised on the internet that WeVeel is wholly owned by those shells.

*Id.* ¶ 104. Finally, she alleges that the latter websites and advertisements "fraudulently conceal" that WeVeel is "selling products stolen from [the Debtor]." *Id.*

Also in April 2010, DiPalma, Recchia and Chiapelli allegedly formed, and became members and officers of, Junto as a "front" that would use the Debtor's Assets to operate its former graphic design division. *Id.* ¶¶ 91, 111. Accordingly, DiPalma and Recchia allegedly transferred the Debtor's graphic design division related [Assets] to Junto just as they transferred the Debtor's toy and craft division related Assets to WeVeel. *Id.* ¶ 94.

Finally, the Trustee alleges that DiPalma, Recchia, and Chiapelli transmitted various communications to the Pennsylvania Department of State that falsely located Junto's headquarters at Chiapelli's residence in Abington, Pennsylvania. *Id.* ¶ 93. According to the Trustee, they used the false address to "conceal the existence of Junto from [the Debtor] and [its] creditors, who did not know of Chiapelli." *Id.*

## H.    Cra-Z-Art and IYA

Cra-Z-Art was possibly the largest of the Debtor's customers before DiPalma and Recchia transferred and/or converted the Debtor's Assets and caused it to cease operating. *Id.* ¶ 141. According to the Trustee, the Debtor performed approximately $60,000 to $70,000 of graphic design work per month for Cra-Z-Art. *Id.* ¶ 139. With respect to this work, the Trustee claims that "it was not unusual" for Cra-Z-Art to pay its invoices nearly two months late, that the Debtor retained exclusive rights to the underlying intellectual property, and that Cra-Z-Art obtained only "single-use" rights. *Id.* ¶¶ 141, 152.

In November 2009, the Trustee alleges that Cra-Z-Art owed the Debtor at least $150,000 in accounts receivable that the Debtor had sold to Chesapeake pursuant to the Factoring Agreement. *Id.* ¶ 140. However, during Chesapeake's investigation of the Debtor's invoicing practices, Cra-Z-Art allegedly denied the validity of $78,395 of true invoices that the Debtor

previously sold to Chesapeake. *Id.* ¶ 146. Angela Graham, a former employee of the Debtor, claims to recall working on many, if not most, of the disputed invoices. *Id.* Ex. G.

Furthermore, after the Debtor ceased operating, Cra-Z-Art allegedly began purchasing $60,000 to $70,000 of graphic design products per month directly from DiPalma and eventually from Junto. *Id.* ¶ 147. The Trustee claims that these products comprised in part the Debtor's transferred and/or converted Assets, or derivatives thereof, despite its allegedly exclusive rights to the underlying intellectual property. *Id.* ¶ 149.

According to the Trustee, Cra-Z-Art and its agent, Larry Rosen ("Rosen"), "were fully aware" that DiPalma and Junto were "dealing in property stolen from [the Debtor] by DiPalma and Recchia." *Id.* ¶ 284. In support thereof, the Trustee alleges that Rosen, DiPalma, and Recchia were "business associate[s] and personal acquaintance[s]" because they "previously contemplated a formal joint venture." *Id.* ¶ 285. "Towards the end of 2009," DiPalma and Recchia allegedly informed Rosen that the Debtor "was going to go out of business" and that they "were planning on declaring personal bankruptcy." *Id.* ¶ 286. Finally, in November 2009, DiPalma and Recchia allegedly "made Rosen aware that they intended to take control of [the Debtor's] equipment and intellectual property . . . [and] planned on continuing to use [the Debtor's] working files and physical equipment to service clients," such as Cra-Z-Art. *Id.* ¶ 287.

The Trustee levies similar allegations against IYA Technologies, LLC, as she does against Cra-Z-Art. First, IYA also allegedly owed to the Debtor accounts receivables that the Debtor had sold to Chesapeake, but in the lesser amount of $58,500, in November 2009. *Id.* ¶ 160. Like Cra-Z-Art, IYA denied the validity of these invoices during the Chesapeake investigation, but in their full amount. *Id.* ¶ 164. Second, IYA also allegedly began purchasing from DiPalma and eventually from Junto graphic design products that comprised in part the

Debtor's transferred and/or converted Assets, or derivatives thereof, after the Debtor ceased operating. *Id.* ¶ 165. With respect to those products, the Trustee claims the Debtor retained exclusive rights to the underlying intellectual property and that IYA, like Cra-Z-Art, was granted only "single-use" rights. *Id.* ¶ 168.

### I.      The Debtor's Bankruptcy

Around the time that the Trustee became the permanent trustee on November 29, 2012, she alleges that DiPalma and Recchia committed two final acts of fraud. *Id.* ¶ 8. First, the Trustee alleges that DiPalma and Recchia formed Paramont Global, Ltd. ("Paramont"), as a fraudulent shell company on November 27, 2012. *Id.* ¶ 174. Simultaneously, they published a website that falsely indicates that WeVeel is owned by Paramont. *Id.*

Finally, the Trustee alleges that DiPalma and Recchia offered "knowingly false and fraudulent testimony under oath" two days later at the Debtor's 11 U.S.C. § 341 meeting of creditors ("341 Meeting"). *Id.* ¶¶ 121, 173. Specifically, (1) DiPalma and Recchia denied that DiPalma was ever an officer or employee of WeVeel or Junto; (2) DiPalma stated that Cullen had stolen and earned $700,000 from the Debtor's Assets; (3) DiPalma misrepresented the disposition of certain Assets of the Debtor's; (4) DiPalma misrepresented who was and was not among the Debtor's customers; (5) Recchia concealed DiPalma's partial ownership of Junto; and (6) Recchia denied that Junto ever used the Debtor's Assets in work that it billed to clients. *Id.*

### J.      The Trustee's Adversary Proceeding

Based upon the preceding events, the Trustee filed the Complaint against the Defendants.[5] DiPalma, Recchia, Lane, WeVeel, and Junto (collectively "Joint Defendants")

---

[5] The Trustee notes that it was not until she was appointed on October 15, 2012 that the Debtor was finally free from DiPalma and Recchia's control and capable of filing this adversary proceeding. Am. Compl. ¶ 9.

obtained joint representation and filed a motion to dismiss the Complaint in its entirety on

October 3, 2014 ("Joint Motion to Dismiss"). Cra-Z-Art also filed a motion to dismiss on

October 3, 2014, but only as to the counts filed against it, Counts I and VIII of the Complaint

("Cra-Z-Art Motion to Dismiss" and collectively with the Joint Motion to Dismiss, "Motions to

Dismiss"). On November 14, 2014, the Trustee filed responses to the Motions to Dismiss. Cra-Z-

Art and the Joint Defendants filed reply briefs on December 24, 2014 and December 29, 2014,

respectively. At the April 13, 2015 hearing on the Motions to Dismiss ("Dismissal Hearing"), the

Court dismissed the Trustee's Complaint without prejudice due to various deficiencies. Order

¶ 1, Apr. 13, 2015, ECF No. 45. The Court also ordered the Trustee to file a RICO case

statement.[6] *Id.* ¶ 2.

The Trustee filed the Amended Complaint against the Defendants and IYA as well as the

Plaintiff's RICO Case Statement, ECF No. 50 ("RICO Case Statement"), on June 15, 2015. The

Amended Complaint raises eight counts that set forth causes of action under RICO against all

Defendants and IYA (Count I); under PUFTA against DiPalma and Recchia, WeVeel, and Junto

(Counts II, IV, and V, respectively); for conversion against DiPalma and Recchia (Count III); for

piercing the corporate veil against WeVeel and Junto (Counts IV and VII, respectively); and for

unjust enrichment against all Defendants and IYA (Count VIII).

The Joint Defendants filed a Motion to Dismiss the Amended Complaint, ECF No. 54 on

July 30, 2015 ("Second Joint Motion") and Cra-Z-Art filed a Motion to Dismiss Counts I and

---

[6] Where necessary "to ensure that plaintiffs adequately assert the circumstances of any alleged RICO violation," it is within the Court's discretion to permit the filing of a RICO case statement. *Train, Inc. v. Pro-Ed, Inc.*, No. CIV. A. 92-CV-5510, 1993 WL 45084, at *5 (E.D. Pa. Feb. 22, 1993). "The RICO Case Statement is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss." *Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network*, No. CIV. A. 99-4653, 2001 WL 41143, at *3 n.1 (E.D. Pa. Jan. 18, 2001) (first citing *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1413 (3d Cir. 1993); then citing *Smith v. Berg*, No. CIV. A. 99-2133, 1999 WL 1081065, at *3–5 (E.D. Pa. Dec. 1, 1999)).

VIII of the Amended Complaint, ECF No. 57 on July 31, 2015 ("Second Cra-Z-Art Motion" and

collectively with the Second Joint Motion, "Second Motions").[7] Based on the ensuing analysis of

the arguments contained in the Second Motions, the Trustee's subsequent responses thereto, and

the Defendants' further replies, the Court grants in part and denies in part the Second Joint

Motion and grants the Second Cra-Z-Art Motion.

## III.    DISCUSSION

### A.    Pleading Standards

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"[8] *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

plausible if the complaint's nonconclusory, factual allegations give rise to "the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp.*, 550

U.S. at 556). Legal conclusions and "threadbare recitals of the elements of a cause of action . . .

do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Although this standard is not a

"probability requirement," there must be "more than a sheer possibility that a defendant has

acted unlawfully." *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 556).

Federal Rule of Civil Procedure 9(b) articulates a heightened pleading standard for fraud

pursuant to which the Trustee must plead the "date, place or time" of the transfers or "use

alternative means of injecting precision and some measure of substantiation."[9] *Image Masters,*

---

[7] Although IYA has failed to respond to the Amended Complaint, the Trustee has not yet filed a motion for default judgment. Therefore, this Opinion and the accompanying Order have no impact on the Trustee's claims against IYA set forth in the Amended Complaint.

[8] Federal Rule of Civil Procedure 12(b)(6) is applicable in adversary proceedings by virtue of Federal Rule of Bankruptcy Procedure 7012(b).

[9] Federal Rule of Civil Procedure 9(b) is applicable in adversary proceedings by virtue of Federal Rule of Bankruptcy Procedure 7009. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with

*Inc. v. Chase Home Fin.*, 489 B.R. 375, 393 (E.D. Pa. 2013) (quoting *Seville Indus. Mach. Corp.*

*v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). "[I]ntent need only be alleged

generally." *Id.* at 395 (citing Fed. R. Civ. P. 9(b)). This heightened pleading standard serves "to

place the defendants on notice of the precise misconduct with which they are charged, and to

safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id.* at 392

(quoting *Seville*, 742 F.2d at 791). Such charges might otherwise wrongly induce settlements or

damage the defendants' reputations. *In re O.E.M./Erie, Inc.*, 405 B.R. 779, 788 (Bankr. W.D. Pa.

2009) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). It

also serves to allow defendants to prepare an adequate answer to the allegations. *Image Masters*,

489 B.R. at 395 (citing *Denny v. Carey*, 72 F.R.D. 574, 578 (E.D. Pa. 1976)). Accordingly, the

Defendants argue that the heightened pleading standard applies to the Trustee's RICO and

fraudulent transfer claims. Second Joint Mot. 11; Second Cra-Z-Art Mot. 5.

   However, the application of Rule 9(b) is relaxed "in cases of corporate fraud," where

plaintiffs "cannot be expected to have personal knowledge of the details of corporate internal

affairs" and the pertinent "factual information is peculiarly within the defendant's knowledge or

control." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).[10] The policy

underlying this practice recognizes that excessive focus on the "particularity requirement" results

in "too narrow an approach and fails to take account of the general simplicity and flexibility

contemplated by the rules." *Id.* (quoting *Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 100 (3d

---

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

   [10] The *Craftmatic* court cited *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (1st ed. 1969); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988); and *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1987).

Cir. 1983)). Furthermore, "sophisticated defrauders" should not be permitted to avoid liability

simply by concealing the details of their fraud. *Id.* (quoting *Christidis*, 717 F.2d at 99–100).

However, even if Rule 9(b) is relaxed, "boilerplate and conclusory allegations will not suffice"

and complaints must contain factual allegations that render the claims asserted therein plausible.

*In re Burlington*, 114 F.3d at 1418 (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d

Cir. 1992)).

In order to enjoy the relaxed application of Rule 9(b) in cases of corporate fraud,

plaintiffs must allege that "the necessary information lies within defendants' control" and must

include "facts indicating why the charges against defendants are not baseless and why additional

information lies exclusively within defendants' control." *Craftmatic Sec. Litig.*, 890 F.2d at 645–

46. Plaintiffs must also "delineate at least the nature and scope of [their] effort to obtain . . . the

information needed to plead with particularity" and "thoroughly investigate all possible sources

of information, including but not limited to all publicly available relevant information, before

filing a complaint." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997) (quoting

*Shapiro*, 964 F.2d at 285).

Accordingly, the Joint Defendants argue that Rule 9(b) should not be relaxed as applied

to the Trustee's RICO and fraudulent transfer claims because she cannot, and does not, allege

that the information pertinent to her allegations of fraud lies exclusively within the Joint

Defendants' control. Second Joint Mot. 11–12, 23–24, 30–31 (quoting *DiMare v. MetLife Ins.

Co.*, 369 F. App'x 324, 330 (3d Cir. 2010)). Cra-Z-Art echoes the Joint Defendants' arguments

regarding the appropriate pleading standard to be applied to the Trustee's RICO claims. *See*

Reply Br. Supp. Mot. to Dismiss Counts I & VIII of the Am. Compl. ("Second Cra-Z-Art

Reply") 3–4, ECF No. 68 (asserting that the Trustee has failed to allege that the relevant

information lies exclusively within the Defendants' control and alleging that such information "is

either with the Debtor . . . or with Chesapeake").

The Defendants are correct that the Trustee has not pleaded in the Amended Complaint

that, or why, the pertinent information lies exclusively within the control of the Defendants and

has therefore failed to avail herself of the relaxed application of Rule 9(b) as it relates to cases of

corporate fraud.[11]

However, the pleading requirements under Rule 9(b) are also relaxed when allegations of

fraud are asserted by trustees in bankruptcy. *E.g.*, *In re: Liberty State Benefits of Del., Inc.*, 541

B.R. 219, 233–34 (Bankr. D. Del. 2015) (holding that the Rule 9(b) pleading requirements

applicable to civil RICO claims involving allegations of fraud can be relaxed when such claims

are filed by bankruptcy trustees); *In re Rite Way Elec., Inc.*, 510 B.R. 471, 480 (Bankr. E.D. Pa.

2014) (holding that the "standard is relaxed where the plaintiff is a trustee in bankruptcy");

*Image Masters*, 489 B.R. at 393 (citing *In re APF Co.*, 308 B.R. 183, 188 (Bankr. D. Del. 2004))

---

[11] In her responsive brief to Cra-Z-Art, however, the Trustee asserted that "the information relating to transactions between DiPalma and Junto on the one hand, and Cra-Z-Art on the other hand, are exclusively within Defendants' control and would be obtained in discovery." Resp. to Mot. to Dismiss Counts I & VIII of the Am. Compl. ("Resp. to Second Cra-Z-Art Mot.") 24, ECF No. 65. Elsewhere in the Trustee's responsive briefs to the Defendants, she sought the relaxed application of Rule 9(b) because the alleged predicate acts relate to corporate fraud, but she never alleged that pertinent information, other than the information relating to DiPalma and Junto's transactions with Cra-Z-Art, lies exclusively within the Defendants' control. Resp. to Mot. to Dismiss Am. Compl. ("Resp. to Second Joint Mot.") 32, ECF No. 66; Resp. to Second Cra-Z-Art Mot. 22.

"In determining the sufficiency of [the plaintiff's] allegations under Rule 9(b), we look only to the complaint; we will not consider the allegations in [the plaintiff's] brief." *DiMare*, 369 F. App'x at 330 (citing *Frederico v. Home Depot*, 507 F.3d 188, 201–02 (3d Cir. 2007)). "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania* ex rel. *Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). Arguments asserted in briefs may be considered "only to the extent that they find support in the allegations set forth in the complaint" and will not be considered to the extent that they "do[] not properly describe what was said in the complaint." *Id.*

Although it is not an unreasonable inference that the information relating to DiPalma and Junto's transactions with Cra-Z-Art lies exclusively within the Defendants' control, the Amended Complaint's allegations do not set forth facts that directly support such an inference. With respect to the fraudulent circumstances surrounding DiPalma and Junto's transactions with Cra-Z-Art, however, whether the Trustee should enjoy the relaxed application of Rule 9(b) as it relates to cases of corporate fraud is a moot question. As explained below, there is an alternative basis upon which the pleading standard may be reduced if the Trustee does not possess the pertinent information.

("The requirements of Rule 9(b) are generally relaxed and interpreted liberally where a trustee is

asserting the fraudulent transfer claims."). The relaxed application of Rule 9(b) to trustees in

bankruptcy does not require that the Trustee plead that the relevant information lies exclusively

within the control of the Defendants. Rather, it is justified by the presumption that the Trustee, as

a third party, is disadvantaged with respect to information regarding frauds committed against

the debtor. *See Rite Way Elec.*, 510 B.R. at 480 (quoting *In re Harry Levin, Inc.*, 175 B.R. 560,

567 (Bankr. E.D. Pa. 1994)) (relaxing the application of Rule 9(b) to trustees because of their

"inevitable lack of knowledge concerning acts of fraud previously committed against the debtor,

a third party"); *In re Joey's Steakhouse, LLC*, 474 B.R. 167, 187 (Bankr. E.D. Pa. 2012) (quoting

*In re Aphton Corp.*, 423 B.R. 76, 85 (Bankr. D. Del. 2010)) (observing that "courts in this circuit

continue to follow the rule that '[a] trustee is generally afforded greater liberality in pleading

fraud, since he is a third-party outsider to the debtor's transactions'").[12]

    Cra-Z-Art argues that the Trustee should be denied the relaxed application of Rule 9(b)

on this alternative basis because she "made no effort at any time" to establish a factual basis for

her claims before she filed the Complaint or the Amended Complaint. Second Cra-Z-Art Reply

5. In support of its argument, Cra-Z-Art relies upon *In re Rite Way Electric, Inc.*, 510 B.R. 471

(Bankr. E.D. Pa. 2014), in which Cra-Z-Art argues that the court "refus[ed] to apply the trustee's

---

[12] *See also O.E.M./Erie*, 405 B.R. at 788 (quoting *In re Glob. Link Telecom Corp.*, 327 B.R. 711, 717
(Bankr. D. Del. 2005)) (relaxing the application of Rule 9(b) to trustees because they "must plead fraud on second
hand knowledge for the benefit of the estate and all of its creditors"); *In re Reading Broad., Inc.*, 390 B.R. 532, 550
(Bankr. E.D. Pa. 2008) (relaxing the application of Rule 9(b) to trustees because they "generally ha[ve] no first-hand
knowledge of the prepetition acts . . . and the corporation may not cooperate with the trustee in this regard"); *In re
MacGregor Sporting Goods, Inc.*, 199 B.R. 502, 514–15 (Bankr. D.N.J. 1995) (citing *In re Hollis & Co.*, 86 B.R.
152, 156 (Bankr. E.D. Ark. 1988); *In re O.P.M. Leasing Servs., Inc.*, 32 B.R. 199, 203 (Bankr. S.D.N.Y. 1983))
(acknowledging that "Rule 9(b) should be interpreted liberally" as applied to trustees); 10 *Collier on Bankruptcy*
¶ 7009.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) (acknowledging the line of cases pursuant
to which "the Rule 9(b) requirement of particularity is relaxed" as applied to trustees).

Case 14-00333-amc    Doc 74    Filed 08/12/16    Entered 08/12/16 16:45:35    Desc Main
Document       Page 22 of 78

reduced pleading standard" in light of the trustee's "shoot first and ask questions later" approach.

Second Cra-Z-Art Reply 4–5 (quoting *Rite Way Elec.*, 510 B.R. at 490).

However, the court in *Rite Way Electric* did not "refuse to apply the trustee's reduced

pleading standard." In fact, it <u>actually</u> <u>applied</u> "the more relaxed Rule 8(a) standard" in

connection with the trustee's fraud claims because "of the trustee's 'inevitable lack of knowledge

concerning acts of fraud previously committed against the debtor, a third party.'" *Rite Way Elec.*,

510 B.R. at 480.

The Court's admonition to the trustee in that case pertained not to his satisfaction of the

applicable pleading standard, but to his investigatory duties under Bankruptcy Code § 704(a)(1),

(4) and Federal Rule of Bankruptcy Procedure 9011(b)(2).[13] *Id.* at 488–90. In *Rite Way Electric*,

the trustee requested that the Court "assist him [in] determining the extent of avoidable transfers

from the Debtor to the Defendants" pursuant to § 329. *Id.* at 489. In response, the Court cited the

trustee's investigatory duties under § 704 and under Rule 9011 in order to explain that "§ 329 is

not intended for the type of use envisioned by the Trustee here" and that the trustee's request for

assistance from the Court related to matters "already among the responsibilities of a trustee under

Chapter 7." *Id.* The Court then admonished the trustee because he failed to make even

"elementary efforts to obtain basic information to support his suspicions" relative to the "serious

matter" of bankruptcy fraud of which he accused another attorney and law firm. *Id.* at 490. The

---

[13] Section 704(a) states, in pertinent part, that "[t]he trustee shall– (1) collect and reduce to money the property of the estate . . . [and] (4) investigate the financial affairs of the debtor." 11 U.S.C. § 704(a). Rule 9011(b) states, in pertinent part, that an attorney that presents a pleading to the Court

certif[ies] that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

Fed. R. Bankr. P. 9011(b).

Court's analysis of the trustee's investigatory shortcomings thus had no bearing on the pleading standard and, as discussed above, the Court actually applied the relaxed pleading standard under Rule 8(a).

Based upon the foregoing reasons, the Court will relax the application of Rule 9(b) to the Trustee in the instant matter on the basis of her disadvantaged position with respect to information regarding frauds committed against the Debtor. However, the Trustee is still subject to the Rule 8(a) pleading standard and "must provide more than mere legal conclusions and cannot simply repeat the elements of the cause of action." *Id.* at 480 (citing *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 494 (Bankr. D. Del. 2010)); *see also In re Moll Grp., LLC*, Bankr. No. 02-38198, Adv. Nos. 04-1113, 04-1115, 2005 WL 6506459, at *9 (Bankr. E.D. Pa. June 15, 2005) ("Merely because a trustee is afforded latitude when pleading fraud claims does not mean that the specificity requirement of Rule 9 may be ignored when a trustee has some pertinent information."). The Trustee must therefore include the pertinent information in the pleadings to the extent that such information is within her possession. *See Moll Grp.*, 2005 WL 6506459, at *9 (granting a motion for a more definite statement relative to "unnecessarily vague" fraudulent transfer claims to the "limited extent" that the trustee did not plead information "in the Debtor's books and records" that were "presently in his possession" and from which the fraudulent transfer claims derived). To the extent that the pertinent information is outside the Trustee's possession, she may plead on information and belief if she sets forth the facts upon which such beliefs are reasonably based. *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 880 (E.D. Pa. 2012) (quoting *Hollander v. Ortho-McNeil-Janssen Pharm., Inc.*, Civ. A. No. 2:10-CV-00836-RB, 2010 WL 4159265, at *4 (E.D. Pa. Oct. 21, 2010)).

**B.    Count I: The Racketeering Influenced and Corrupt Organizations Act Claims Against All Defendants**

RICO criminalizes certain conduct listed in 18 U.S.C. § 1962. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 6 (2010). It also provides that "[t]hose who have been wronged by organized crime should at least be given access to a legal remedy." *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 487 (1985) (quoting *Organized Crime Control: Hearing on S. 30 Before the Subcomm. No. 5 of the Comm. on the Judiciary*, 91st Cong. 520 (1970)). Therefore, § 1964(c) "provides a private civil action" through which plaintiffs may seek recovery for injuries caused "by reason of a violation of" RICO's criminal provisions. *Id.* at 481 (quoting 18 U.S.C. § 1964(c)).

Accordingly, Count I of the Amended Complaint arises under § 1964(c) and asserts civil claims against the Defendants for alleged violations of §§ 1962(a), (c), and (d). Am. Compl. ¶¶ 176–232. To plead under § 1964(c), however, the Trustee must establish "standing" thereunder. *Rose v. Bartle*, 871 F.2d 331, 357 n.40 (3d Cir. 1989). In order to establish standing under § 1964(c), the Trustee must allege (1) an injury to the Debtor's "business or property," and (2) a violation of RICO's criminal provisions that "proximately caused" the injury. *Macauley v. Estate of Nicholas*, 7 F. Supp. 3d 468, 479 (E.D. Pa. 2014) (quoting 18 U.S.C. § 1964(c)).

The Trustee and the Defendants have extensively argued whether the facts alleged in the Amended Complaint state violations of RICO's criminal provisions under §§ 1962(a), (c) and (d) and actionable injuries under § 1964(c). As explained below, the Court agrees with the Defendants that the Amended Complaint fails to state actionable injuries under § 1964(c). The Court therefore dismisses the Trustee's civil RICO claims against the Defendants for lack of standing and need not examine whether she adequately alleged the elements of the underlying violations of § 1962.

1.    Standing

Section § 1964(c) articulates a "standing requirement" with respect to the alleged RICO

violations and the resulting injuries. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d

494, 520 (3d Cir. 1998). Section 1964(c) states that "[a]ny person injured in his business or

property by reason of a violation of section 1962 of this chapter may sue therefor in any

appropriate United States district court." 18 U.S.C. § 1964(c).

A civil RICO claim will therefore fail if the plaintiff's business or property was not

injured "directly" or "by reason of" the alleged violations. *Hemi Grp.*, 559 U.S. at 18; *see also In

re Jamuna Real Estate, LLC*, 392 B.R. 149, 171 (Bankr. E.D. Pa. 2008) (quoting *Holmes v. Sec.

Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)) (conditioning the proximate cause analysis on

"some direct relationship between the injury asserted and the injurious conduct alleged").

Although RICO is "liberally construed to effectuate its remedial purposes," those purposes

would be more "hobbled than helped" if courts permitted "massive and complex damages

litigation" by indirectly injured plaintiffs. *Holmes*, 503 U.S. at 274 (quoting *Associated Gen.

Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)).

"[T]hree key factors" comprise the standing requirement's proximate cause analysis in

order to determine whether the alleged RICO violations are "too remote" from the resulting

injuries. *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 261 (3d Cir. 1999). Those factors are: (1) the

difficulty of apportioning causation between the alleged violation "as distinct from other,

independent, factors"; (2) the difficulty of apportioning "damages among plaintiffs removed at

different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and

(3) the extent to which "directly injured victims can generally be counted on to vindicate the law

as private attorneys general." *Id.* (quoting *Holmes*, 503 U.S. at 269–70); *see also Hemi Grp.*, 559

U.S. at 8 (clarifying that these factors comprise "the standard of causation that applies to civil

RICO claims," generally). The Supreme Court, however, has articulated that "[t]he general

tendency of the law, in regard to damages at least, is not to go beyond the first step. . . . Our

cases confirm that the 'general tendency' applies with full force to proximate cause inquiries

under RICO." *Hemi Grp.*, 559 U.S. at 10 (quoting *Holmes*, 503 U.S. at 271–72).

To determine whether the violations allegedly committed by the Defendants proximately

caused the injuries allegedly suffered by the Debtor, it is first necessary to set forth what

constitutes such violations. As stated above, the Trustee asserts civil claims against the

Defendants for alleged violations of §§ 1962(a), (c) and (d).

2. <u>Section 1962(a)</u>

Section 1962(a) states, in pertinent part:

> It shall be unlawful for any person who has received any income derived, directly
> or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or
> indirectly, any part of such income, or the proceeds of such income, in acquisition
> of any interest in, or the establishment or operation of, any enterprise which is
> engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). The elements of a violation of § 1962(a) therefore include "(1) that the

defendant has received money from a pattern of racketeering activity; (2) invested that money in

an enterprise; and (3) that the enterprise affected interstate commerce." *Lightning Lube, Inc. v.*

*Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993) (citing *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d

1162, 1165 (3d Cir. 1989)). The actionable injury that results from a § 1962(a) violation derives

from "the use or investment of racketeering income" generated by the enterprise. *Id.* (quoting

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir. 1991)).

3. <u>Section 1962(c)</u>

Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The elements of a violation of § 1962(c) are therefore (1) the conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity. *In re Ins. Brokerage Antitrust*

*Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir.

2004)).

### *"Conduct"*

To "conduct" a RICO enterprise, one must "participate[] in the operation or management

of the enterprise." *Id.* at 371 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).

However, the defendant must operate or manage the enterprise "*through* a pattern of racketeering

activity." *Id.* at 372 (emphasis added). In other words, there must be a "nexus" between the

defendant, his conduct of the affairs of the enterprise, and the pattern of racketeering activity. *Id.*

at 371 (quoting *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d

Cir. 1993)) (citing *Banks v. Wolk*, 918 F.2d 418, 424 (3d Cir. 1990)).

### *"Enterprise"*

An "enterprise" may consist of "a group of persons associated together for a common

purpose of engaging in a course of conduct," which is termed an "association-in-fact enterprise."

*United States v. Turkette*, 452 U.S. 576, 583 (1981). An association-in-fact enterprise must

exhibit a (1) "purpose"; (2) "relationships among those associated with the enterprise"; and (3)

"longevity sufficient to permit these associates to pursue the enterprise's purpose." *Ins.*

*Brokerage Antitrust Litig.*, 618 F.3d at 369–70 (quoting *Boyle v. United States*, 556 U.S. 938,

946 (2009)). Although the enterprise must be "engaged in," or its activities must affect,

"interstate or foreign commerce," 18 U.S.C. § 1962(c), the "nexus" between the enterprise and

interstate commerce may be "minimal." *Rose*, 871 F.2d at 357 (quoting *R.A.G.S. Couture, Inc. v.*

*Hyatt*, 774 F.2d 1350, 1353 (5th Cir. 1985)). It is sufficient that the enterprise itself affects

interstate commerce through the predicate acts; the conduct of each defendant need not

independently affect interstate commerce. *Id.* at 357 n.38 (citing *United States v. Robinson*, 763

F.2d 778, 781 n.4 (6th Cir. 1985); *R.A.G.S. Couture*, 774 F.2d at 1353).

*"Pattern"*

A "pattern" of racketeering activity must consist of at least two "predicate acts." *Banks*,

918 F.2d at 421. The two predicate acts of racketeering activity necessary to establish a pattern

must (1) occur within ten years of each other, (2) be "related," and (3) "amount to or pose a

threat of continued criminal activity." *United States v. Bergrin*, 650 F.3d 257, 266–67 (3d Cir.

2011) (citing 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Predicate acts are related if they "have the same or similar purposes, results, participants,

victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics

and are not isolated events." *See H.J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)) (noting

that the statute setting forth the applicable standard is now partially repealed).

In contrast, continuity is "centrally a temporal concept." *Id.* at 242. A pattern of

racketeering activity is continuous if it demonstrates either "closed-ended" or "open-ended"

continuity. Closed-ended continuity may refer to "a series of related predicates extending over a

substantial period of time" that constitute "a closed period of repeated conduct." *Id.* at 241–42.

Open-ended continuity may refer to "a single criminal scheme" if the predicate acts "present the

threat of future criminal activity." *Banks*, 918 F.2d at 422. A threat of continuity exists if the

predicate acts are committed "as part of a long-term association that exists for criminal purposes"

or as "a regular way of conducting [an] ongoing legitimate business . . . or of conducting or

participating in an ongoing and legitimate RICO 'enterprise.'" *H.J. Inc.*, 492 U.S. at 242–43.

- 26 -

*"Racketeering Activity"*

Section 1961(1) lists the "criminal activities that constitute predicate acts for [the] purposes of RICO." *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002). Predicate acts under § 1961(1) include, but are not limited to "any act which is indictable" under several listed federal criminal provisions—including mail and wire fraud, obstruction of justice or of a criminal investigation, interstate transportation of stolen property—and "any offense involving fraud connected with a case under" the Bankruptcy Code.[14] 18 U.S.C. § 1961(1).

### 4.    Section 1962(d)

Section 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The elements of a claim under § 1962(d) therefore include "(i) an agreement to commit the alleged predicate acts, and (ii) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)." *Freedom Med. Inc. v. Gillespie*, 634 F. Supp. 2d 490, 515 (E.D. Pa. 2007) (citing *Rose*, 871 F.2d at 366).

### 5.    The Parties' Arguments

As discussed above, the Trustee must demonstrate that each Defendant's alleged violation of § 1962(a), § 1962(c), or § 1962(d) proximately caused an injury to the Debtor in order to establish standing under § 1964(c). At the outset, the Trustee alleges that the Defendants violated § 1962(a) by using "the income derived from the pattern of racketeering activity to grow

---

[14] It is not necessary that the defendant was actually convicted of these predicate acts, but only that they are "acts for which he could be" convicted. *Sedima*, 473 U.S. at 488. To support a civil RICO claim, the plaintiff most likely need only satisfy a preponderance standard with respect to whether the defendant committed the predicate acts of which he is accused. *See id.* at 491 (suggesting that conclusion, but declining to "decide the standard of proof issue").

and expand their businesses that continue to operate in a manner that uses [the Debtor's Assets] for their benefit and profit." Pl.'s RICO Case Statement ¶ 11(b).

With regard to the § 1962(c) violation, the Trustee alleges that the Defendants conduct a pattern of racketeering activity through the predicate acts of mail and wire fraud, obstruction of justice, transporting and receiving stolen property, and bankruptcy fraud. Specifically, the Trustee alleges that DiPalma oversees and directs the operations of an association-in-fact enterprise that consists of himself, Recchia, Lane, WeVeel, Junto, Cra-Z-Art, and IYA ("RICO Enterprise"). Am. Compl. ¶¶ 182–83. The purpose of the enterprise allegedly has been and continues to be to "defraud" the Debtor and its creditors by "looting the assets and business from [the Debtor]; abandoning [the Debtor] in a position wherein it is unable to pay its debts; secreting, using, and transferring [the Debtor's] assets and business to themselves and business entities; [and] concealing these actions from [the Debtor] and its creditors." Id. ¶ 182; Pl.'s RICO Case Statement ¶ 2.

The Trustee further argues that the Defendants have served and continue to serve various distinct and common roles within the RICO Enterprise. As explained above, DiPalma and Recchia allegedly "loot[ed]" the Debtor's Assets and transferred its former toy and craft and graphic design divisions to WeVeel and Junto. Am. Compl. ¶ 183(a)–(b). In turn, WeVeel and Junto allegedly serve as "front[s]" through which the Defendants presently conduct each division. Id. ¶ 183(d)–(e). Lane allegedly assists in conducting the Debtor's former toy and craft division through WeVeel and serves as its "public face." Id. ¶ 183(c). Collectively, DiPalma, Recchia, Lane, WeVeel, and Junto allegedly "help[] to conceal" the Defendants' actions from the Debtor and its Creditors. Id. ¶ 183(a)–(e). Finally, Cra-Z-Art and IYA allegedly purchased from

- 28 -

the other Defendants the products and services that they formerly purchased from the Debtor and thereby "finance the operation" of the RICO Enterprise. *Id.* ¶¶ 149–50, 166–67, 183(f).

Pursuant to their roles within the RICO Enterprise, the Trustee alleges that the Defendants conduct a pattern of racketeering activity through the predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343; obstruction of justice, 18 U.S.C. § 1512; transporting and receiving stolen property, 18 U.S.C. §§ 2314–15; and bankruptcy fraud, 18 U.S.C. § 152. Pl.'s RICO Case Statement ¶ 5(a); Am. Compl. ¶¶ 204–07. The alleged predicate acts of mail and wire fraud consist of the following:

(1) From February 2009 to November 2009, through mail, email, telephone conversations, and text messages, DiPalma and Recchia allegedly sold the fabricated invoices to Chesapeake. Am. Compl. ¶ 57; Resp. to Second Joint Mot. 34.

(2) From June 2009 to December 2009, through mail, email, telephone conversations, and text messages, DiPalma and Recchia allegedly falsely convinced Cullen that he would be named "President and sole member of SRB" and would profit from its sales as partial satisfaction of the debt owed to him by the Debtor. Am. Compl. ¶ 50(a)–(b); Resp. to Second Joint Mot. 33.

(3) From June 2009 to December 2009, through mail, email, telephone conversations, and text messages with the Debtor's creditors, in order to delay the creditors' discovery of the enterprise's other activities, DiPalma and Recchia allegedly misrepresented the Debtor's "strength and solvency"; falsely claimed that the Debtor would pay its debts with incoming receivables; and, finally, misrepresented the Debtor as an assetless, defunct corporation. Am. Compl. ¶¶ 53, 68(h); Resp. to Second Joint Mot. 34.

(4) On December 10, 2009, in telephone conversations with Chesapeake and its attorney, DiPalma and Recchia allegedly falsely denied their participation in the fraud upon Chesapeake. Am. Compl. ¶¶ 127, 201(a); Resp. to Second Joint Mot. 37. On January 13, 2010, in an email to Chesapeake and its attorney, DiPalma allegedly repeated those falsities. Am. Compl. ¶¶ 128, 201(b).

(5) From January 2010 to August 2012, during various telephone conversations with a U.S. Attorney, DiPalma and Recchia allegedly falsely reaffirmed that they did not participate in the fraud upon Chesapeake. *Id.* ¶¶ 134, 205; Resp. to Second Joint Mot. 38.

(6) On February 23, 2010, DiPalma and Recchia allegedly submitted their individual bankruptcy petitions through mail and wire to the Court and to their creditors that

- 29 -

"falsely failed to disclose" their possession of the Debtor's Assets, their income derived therefrom, and the Debtor's corresponding status as an unsecured creditor. Am. Compl. ¶¶ 115–17, 195; Resp. to Second Joint Mot. 36–37.

(7) On April 12, 2010, DiPalma, Recchia, and Junto allegedly transmitted communications through mail and wire to the Pennsylvania Department of State that falsely located Junto's headquarters at Chiapelli's home. Am. Compl. ¶¶ 93, 189(a); Resp. to Second Joint Mot. 35.

(8) In the spring of 2010, DiPalma, Recchia, Lane, and WeVeel allegedly committed three distinct acts of mail and wire fraud in relation to the location of WeVeel's headquarters, corporate structure, and products. *See* Am. Compl. ¶¶ 104, 189(b)–(d) (alleging that they published a website that falsely located WeVeel's headquarters in Texas and "falsely conceal[ed]" that DiPalma and Recchia are members, officers, and employees of WeVeel; published "internet advertisements" that falsely identified WeVeel as a wholly owned subsidiary of fraudulent shell companies; and submitted the fraudulent shell companies' formation documents "by U.S. mail and/or through the internet"); Resp. to Second Joint Mot. 35–36 (adding that WeVeel's website and advertisements falsely concealed that its products were stolen from the Debtor's former toy and craft division).

(9) On November 27, 2012, DiPalma, Recchia, Lane, and WeVeel allegedly published a website that falsely identified WeVeel as owned by Paramont Global, Ltd. Am. Compl. ¶¶ 174, 226; Resp. to Second Joint Mot. 39.

The predicate acts of obstruction of justice consist of the following:

(10) According to the Trustee, DiPalma and Recchia "knew or had reason to know that" Chesapeake would relay "to a law enforcement agency for use in a criminal investigation" the falsities that they communicated to Chesapeake in the 2009 telephone conversation and in the January 13, 2010 email. Am. Compl. ¶ 204.

(11) And, as stated above, during various telephone conversations from January 2010 to August 2012, DiPalma and Recchia allegedly falsely denied and concealed that they participated in the sale of fabricated invoices to Chesapeake directly to the U.S. Attorney. Am. Compl. ¶¶ 134, 205; Resp. to Second Joint Mot. 38.

The predicate acts of the transportation and receipt of stolen property consist of the following:

(12) In the spring of 2010, WeVeel allegedly transported from Pennsylvania and received at Lane's offices in Texas more than $100,000 of the Debtor's Assets, including its "intellectual property, computer files, drawings, product designs, working and native files, and works-in-progress." Am. Compl. ¶¶ 98, 192; Resp. to Second Joint Mot. 39.

(13) From January 2010 to the present, DiPalma, Junto, and Cra-Z-Art allegedly have repeatedly transported from Pennsylvania, and Cra-Z-Art has received at its

headquarters in New Jersey, more than $5,000 of the Debtor's Assets. Am. Compl.
¶¶ 147, 154, 208; Resp. to Second Joint Mot. 39–40.

The predicate acts of bankruptcy fraud consist of the following:

> (14) On February 23, 2010, DiPalma and Recchia allegedly concealed from or failed
> to disclose to the Court and the trustees in their individual bankruptcies their
> possession of the Debtor's Assets, their income derived therefrom, and that they
> transferred the Debtor's Assets to WeVeel and Junto. Am. Compl. ¶¶ 115–16, 119–
> 20, 197; Resp. to Second Joint Mot. 36–37.

> (15) On November 29, 2012, DiPalma and Recchia allegedly offered false testimony
> to the Trustee at the Debtor's 341 Meeting "to conceal from the Trustee . . . that the
> [Defendants] were using" the Debtor's Assets. Am. Compl. ¶¶ 121, 223; Resp. to
> Second Joint Mot. 38.

> (16) On February 23, 2010, DiPalma and Recchia allegedly falsely verified as true
> and accurate the Schedules and Statements of Financial Affairs that they attached to
> their respective bankruptcy petitions. Am. Compl. ¶¶ 118, 196; Resp. to Second Joint
> Mot. 36.

> (17) DiPalma and Recchia's statements to the Trustee at the Debtor's 341 Meeting on
> November 29, 2012 also allegedly constituted false oaths. Am. Compl. ¶¶ 121, 223;
> Resp. to Second Joint Mot. 38.

Finally, the Trustee alleges that the Joint Defendants violated § 1962(d) by pursuing "a

common plan and agreement to engage in the pattern of racketeering activity" as evidenced by

their "pervasive participation in the overt acts of the pattern of racketeering activity." Pl.'s RICO

Case Statement ¶ 14. With respect to Cra-Z-Art and IYA, she alleges that the "responsible

officials of the companies had knowledge of the pattern of racketeering activity and acted

repeatedly to facilitate the racketeering activity of the other defendants." Id.

The Trustee alleges that the Debtor sustained the same injury for each of the § 1962

violations: namely, the loss of the Debtor's "right to use, possess, control and enjoy the benefits

of the [Debtor's Assets] as well as the loss of its receivables and profits." Id. ¶ 15; Am. Compl.

¶ 231. In addition, the Trustee fails to break out the direct causal relationship between each of the

§ 1962 violations and the alleged injuries as required by § 1964(c) and instead sets forth the

same direct causal relationship between the injuries and all of the § 1962 violations as: "[t]he

continuous use" of the Debtor's Assets and international sale of Debtor created products, which

forced the Debtor to file bankruptcy, injured the Debtor's creditors, and provided "tremendous

revenue and profits" for the Defendants. Pl.'s RICO Case Statement ¶ 16.

The Defendants argue, *inter alia*, that the Debtor's alleged injuries were caused not by

the alleged § 1962 violations, but by the alleged fraudulent transfer and/or conversion of the

Debtor's Assets and therefore are not actionable injuries under § 1964(c). Second Joint Mot. 26–

27; Second Cra-Z-Art Mot. 7. In addition, with respect to the alleged violations of § 1962(a), the

Defendants also argue that "the mere use of racketeering proceeds to support a business that

continues to engage in the racketeering activities that produced those profits does not qualify as

an investment injury." Second Cra-Z-Art Mot. 13 (citing *Brittingham*, 943 F.2d at 303–05); *see*

*also* Second Joint Mot. 26 (citing *Rose*, 871 F.2d at 357) (stating that "in order to show a

violation of 1962(a) the injury alleged must have been the result of the investment of proceeds of

racketeering income, not the predicate acts themselves").

In response, it appears that the Trustee misconstrues the Defendants' arguments and

mistakenly believes that the Defendants seek to dismiss the Amended Complaint because it "fails

to identify a RICO injury." Resp. to Second Joint Mot. 49. As a result, the Trustee focuses her

arguments on how the Debtor was injured without relating such alleged injuries directly back to

each of the alleged violations of § 1962 as required by § 1964.

      6.    Analysis

As explained above, the Trustee must allege (1) an injury to the Debtor's "business or

property," and (2) a violation of RICO's criminal provisions that "proximately caused" the injury

to demonstrate standing under § 1964(c). *Macauley*, 7 F. Supp. 3d at 479 (quoting 18 U.S.C.

§ 1964(c)). With regard to the proximate cause requirement, the Supreme Court has recognized

- 32 -

the "demand for some direct relationship between the injury asserted and the injurious conduct alleged." *Holmes* at 268.

Thus, the proximate cause requirement for a § 1962(c) violation will not be satisfied where, for example, the alleged predicate acts consist of mail and wire fraud and the plaintiff's alleged injuries resulted from "other, independent common law torts such as conversion or breach of fiduciary duty." *See Jamuna Real Estate*, 392 B.R. at 172 (concluding that the plaintiff's injuries, including the "diversion of funds, misuse of bankruptcy, and deepening insolvency," were not proximately caused by the alleged predicate acts). Similarly, with regard to a § 1962(a) violation, the proximate cause requirement will not be satisfied where the plaintiff's injury was not directly caused by the defendant's use or investment of income in an enterprise. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006) (remanding to determine "whether petitioners' alleged violation of § 1962(a) proximately caused the injuries [plaintiff] asserts"). Finally, the Supreme Court has held that "a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." *Beck v. Prupis*, 529 U.S. 494, 507 (2000).

At the outset, the Court notes that the Trustee has failed to separately identify: (1) the injury sustained by the Debtor related to each of the violations under §§ 1962(a), (c), and (d); and (2) the direct causal relationship between such injury and each of the § 1962 violations, as required under § 1964(c). Rather, the Trustee alleges that the Debtor sustained the same injury from each violation of § 1962 and that the same direct causal relationship exists between such injury and each of the § 1962 violations. The Supreme Court has noted that "[b]ecause § 1962(c) and § 1962(a) set forth distinct prohibitions, it is at least debatable whether [plaintiff's] claims

- 33 -

should be analyzed in an identical fashion for proximate-cause purposes." *Anza*, 547 U.S. at 462. The Court is equally skeptical about how the same injury could also be directly caused by the alleged § 1962(d) violation and therefore recognizes that it is at least questionable whether the same alleged injuries could have been directly caused by a violation of § 1962(a), § 1962(c), and § 1962(d).

Ultimately, a close review of the connection between the alleged injury and each of the alleged § 1962 violations reveals that there is no direct causation. As the Joint Defendants and Cra-Z-Art correctly observe, none of the alleged injuries to the Debtor's possessory and financial interests resulted directly from the § 1962 violations allegedly committed by either of them. Instead, those injuries, if proven, could only have been directly caused by DiPalma and Recchia fraudulently transferring or converting the Debtor's Assets.

In particular, with regard to § 1962(a), the Trustee alleges that the Defendants used the income generated from their racketeering activity (i.e., the commission of the predicate acts of mail and wire fraud, obstruction of justice, transporting and receiving stolen property, and bankruptcy fraud) towards their RICO Enterprise "to grow and expand their businesses that continue to operate in a manner that uses [the Debtor's Assets] for their benefit and profit." Pl.'s RICO Case Statement ¶ 11(b). The Trustee alleges that the Defendants' use of income in this manner has injured the Debtor by depriving it of its "right to use, possess, control and enjoy the benefits of the [Debtor's Assets] as well as the loss of its receivables and profits." *Id.* ¶ 15.

However, the Defendants' alleged use of income generated by racketeering activity did not directly injure the Debtor. Rather, it appears that the alleged injuries (the loss of the Debtor's Assets and future profits from the Debtor's Assets) were directly caused by the alleged

- 34 -

fraudulent transfer and/or conversion of the Debtor's Assets and <u>not</u> by the Defendants' use of

income received from the racketeering activity.[15]

Similarly, the Defendants' alleged violation of § 1962(c) through the commission of the

predicate acts of mail and wire fraud, obstruction of justice, transporting and receiving stolen

property, and bankruptcy fraud did not directly cause the loss of the Debtor's Assets and future

profits from such assets. Rather, the Debtor's loss of its assets and future profits was directly

caused by the alleged fraudulent transfer and/or conversion of the Debtor's Assets.

---

[15] Furthermore, even if the Trustee had satisfied the standing requirement under § 1964(c) in connection with the § 1962(a) violation, the Court would have held that she failed to state a claim for a violation of § 1962(a). As recognized by the Defendants, "the mere use of racketeering proceeds to support a business that continues to engage in the racketeering activities that produced those profits does not qualify as an investment injury." Second Cra-Z-Art Mot. 13 (citing *Brittingham*, 943 F.2d at 303–05); *see also* Second Joint Mot. 26 (citing *Rose*, 871 F.2d at 357) (stating that "in order to show a violation of 1962(a) the injury alleged must have been the result of the investment of proceeds of racketeering income, not the predicate acts themselves").

"[I]f the mere reinvestment of racketeering income 'were to suffice [as an injury under section 1962(a) ], the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation.'" *Lightning Lube*, 4 F.3d at 1189 (quoting *Brittingham*, 943 F.2d at 305). "Over the long term, corporations generally reinvest their profits regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act." *Id.* (quoting *Brittingham*, 943 F.2d at 305). The injury that results from the mere reinvestment of racketeering income actually "stems from the pattern of racketeering" itself, rather than from the reinvestment. *Id.* at 1188. If the reinvestment of racketeering income into an enterprise to perpetuate its pattern of racketeering activity did give rise to an actionable injury for a § 1962(a) violation, then "the distinction between § 1962(a) and § 1962(c) would become meaningless." *Brittingham*, 943 F.2d at 305.

In particular, the reinvestment of property or of proprietary information derived from a pattern of racketeering activity into an enterprise does not give rise to a violation of § 1962(a). *Lightning Lube*, 4 F.3d at 1189. There is no meaningful distinction between "the reinvestment of monies obtained by fraud and the reinvestment of proprietary information obtained through misappropriation" because in each situation "the real injury to the plaintiff is the theft of its property . . . and not the investment of that property in an otherwise legitimate business." *Id.* Likewise, if property diverted by a pattern of racketeering activity is reinvested into the enterprise, an actionable injury therefor must be "derivative of the *uses* to which the diverted" property was put, not a "consequence" of the *acquisition* of the property itself or the "*missed opportunity* to make the very investment that defendants made." *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 360–61 (3d Cir. 2010) (emphasis added). The Trustee therefore does not allege that the Defendants invested income in a manner that violates § 1962(a).

The Trustee alleges that the Defendants merely reinvested the racketeering income generated by the pattern of racketeering activity listed above into the RICO Enterprise. The Trustee therefore does not allege that the Debtor was injured by the use to which the racketeering income was put, but that it was injured by the pattern of racketeering activity itself, and does not allege an actionable injury for the alleged violation of § 1962(a).

In addition, the alleged predicate acts under § 1962(c), listed above, targeted nearly exclusively *third parties*—such as Cullen, Chesapeake, the Federal Government, the State, the Bankruptcy Court, and the Debtor's creditors. The Debtor was therefore, at most, indirectly injured by the acts allegedly committed by the Joint Defendants and Cra-Z-Art and, as explained above, the Court will not "go beyond the first step" in the chain of causation. *Cf. Hemi Grp.*, 559 U.S. at 10–12 (quoting *Holmes*, 503 U.S. at 271–72) (rejecting a theory of causation that "requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)"); *Callahan*, 182 F.3d at 241–42 (rejecting a theory of causation in which the defendants were rival beer distributors of the plaintiffs and purchased inventory at a discount by "defraud[ing] the Pennsylvania Liquor Control Board" and therefore concluding that "the plaintiffs [were] relatively remote third-party 'victims' of the fraud"); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932–33 (3d Cir. 1999) (rejecting a theory of causation in which the plaintiffs "suffered a loss because of the harm that the defendants brought upon [a] third party" as "much too speculative and attenuated to support a RICO claim"). Indeed, the Third Circuit has "rejected the notion that proximate cause exists where a defendant . . . targets a third party . . . in order to further a scheme against the plaintiff's interests" because "[i]n such circumstances, the plaintiff is not the 'direct target' of the RICO scheme and the plaintiff lacks RICO standing." *Nw. Human Servs., Inc. v. Panaccio*, No. Civ.A. 03-157, 2004 WL 2166293, at *5 (E.D. Pa. Sept. 24, 2004).

Moreover, under § 1961(1), "RICO's list of acts constituting predicate acts of racketeering activity is exhaustive." *Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999). And

"garden-variety state law crimes, torts, and contract breaches," are <u>not</u> included in the list of predicate acts. *Id.* "This is for good reason," because if such causes of action

> were to constitute predicate acts of racketeering . . . civil RICO law, which is already a behemoth, *would swallow state civil and criminal law whole*. Virtually every litigant would have the incentive to file their breach of contract and tort claims under the federal civil RICO Act, as treble damages and attorney's fees would be in sight.

*Id.* (emphasis added). The Trustee therefore lacks standing to assert civil claims for the alleged violation of § 1962(c) because the Debtor's alleged injuries were proximately caused by independent state law causes of action (i.e., fraudulent transfers and conversion), not the alleged predicate acts.

Finally, with regard to the alleged conspiracy violation under § 1962(d), the Trustee alleges that the Joint Defendants' "pervasive participation in the overt acts of the pattern of racketeering activity shows a common plan and agreement to engage in the pattern of racketeering activity." Pl.'s RICO Case Statement ¶ 14. The Trustee alleges that, with respect to Cra-Z-Art, the "responsible officials . . . had knowledge of the pattern of racketeering activity and acted repeatedly to facilitate the racketeering activity of the other defendants. Among other things, Cra-Z-Art . . . lied to Chesapeake Bank during its investigation regarding the fraudulent invoices in furtherance of the RICO enterprise." *Id.*

However, neither the Joint Defendants' alleged participation in the commission of the predicate acts nor Cra-Z-Art's alleged knowledge and facilitation of the commission of the predicate acts directly caused the loss of the Debtor's Assets and future profits from such assets. Rather, as discussed above, the Debtor's loss of its assets and future profits was directly caused by the alleged fraudulent transfer and/or conversion of the Debtor's Assets. Accordingly, the Trustee also lacks standing under § 1964(c) to bring a claim for a violation under § 1962(d).

- 37 -

Based upon the foregoing, the Debtor's alleged RICO injuries can only be remedied through the direct pursuit of such state law causes of action as asserted elsewhere in the Amended Complaint against the Joint Defendants and Cra-Z-Art.[16] Accordingly, the Court will dismiss Count I of the Amended Complaint in its entirety as to the Joint Defendants and Cra-Z-Art.

### C.    Count II: Fraudulent Transfer Claims Against DiPalma and Recchia

In Count II of the Amended Complaint, the Trustee asserts claims against DiPalma and Recchia under PUFTA's actual and constructive fraudulent transfer provisions.[17] Am. Compl. ¶¶ 233–39. In support of the fraudulent transfer claims, the Trustee alleges that, at all relevant times, (1) the Debtor had at least one creditor; (2) DiPalma and Recchia transferred the Debtor's Assets "with actual intent to hinder, delay and/or defraud [the Debtor's] creditors"; (3) DiPalma and Recchia did not give the Debtor reasonably equivalent value in exchange for the transfers; and (4) when DiPalma and Recchia transferred the Assets, the Debtor was insolvent.[18] *Id.* ¶¶ 235–38.

---

[16] With respect to the claim of being injured by the "loss of its receivables," the Debtor supposedly was compensated for the receivables pursuant to the Factoring Agreement. In any event, the appropriate remedy with respect to this claim lies in breach of contract which is not listed as a predicate act in § 1961(1).

[17] PUFTA and its comments "were drafted by a committee . . . of the Section on Corporation, Banking and Business Law of the Pennsylvania Bar Association." PUFTA § 5101 cmt. 1. "The comments are part of the legislative history of [PUFTA] under 1 Pa.C.S. § 1939." *Id.* The comments may therefore "be consulted in the construction or application of the original provisions of the statute." 1 Pa. Stat. and Cons. Stat. Ann. § 1939 (West 2016); *see also* Gregory M. Monaco, *A Practitioner's Primer on the Pennsylvania Uniform Fraudulent Transfer Act*, Pa. B. Ass'n Q., Jan. 2015, at 18, 20 (stating that "pursuant to 1 Pa.C.S. §1939, the detailed Committee Comment . . . that follows each section of PUFTA is not only informative, but it bears directly on the interpretation of the statute").

[18] Pursuant to § 544(b)(1), the Trustee is authorized to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). In turn, § 502(a) allows any unsecured claim, "proof of which is filed under section 501 of this title," unless a valid objection to such a claim is raised. *Id.* § 502(a). Several unsecured creditors in this case have filed proofs of claim that have not been objected to. Claims Register, Bankr. No. 12-17235-AMC. The Trustee may therefore assert fraudulent transfer claims under PUFTA sections 5104–05 pursuant to her authority under § 544. *See In re Polichuk*, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014) (acknowledging that § 544(b) "allows the bankruptcy trustee to stand in the shoes of an actual creditor" to assert a cause of action

Pursuant to Rule 12(b)(6), the Joint Defendants argue that "the Amended Complaint contains only 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" Second Joint Mot. 30 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, the Joint Defendants erroneously address the wrong cause of action—a federal constructive fraudulent transfer claim under § 548(a)(2)—in their brief which was never raised by the Trustee in the Amended Complaint.[19] *See id.* (citing *In re R.M.L., Inc.*, 92 F.3d 139, 144 (3d Cir. 1996)) (analyzing avoidance actions under § 548(a)(2)).

The Joint Defendants also argue that the Trustee did not plead the claims with sufficient particularity under Rule 9(b). *Id.* at 30–33. Although they correctly assert that the Trustee should not enjoy the relaxed application of Rule 9(b) in cases of corporate fraud because she failed to plead that the relevant information lies exclusively within the Defendants' control, *id.* at 31 (citing *DiMare v. MetLife Ins. Co.*, 369 F. App'x 324, 330 (3d Cir. 2010)), they fail to recognize that Rule 9(b) is relaxed as applied to trustees in bankruptcy, as explained above.

---

under PUFTA); 5 *Collier on Bankruptcy* ¶ 548.01[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) (stating that under § 544, the Trustee may "step into the shoes of a creditor of the debtor, and utilize applicable state law to avoid a transaction").

As the alleged transferees, DiPalma and Recchia may be named as the defendants to actions under PUFTA sections 5104–05. "It is well-recognized that recovery from the transferee is one of the potential avenues for relief by a plaintiff pursuing a fraudulent transfer case." *In re Lockwood Auto Grp., Inc.*, 428 B.R. 629, 640 (Bankr. W.D. Pa. 2010) (citing *United States v. Rocky Mountain Holdings, Inc.*, Civ. A. No. 08-3381, 2009 WL 564437, at *3 (E.D. Pa. Mar. 4, 2009)); *see also* PUFTA § 5108(b)(1) (authorizing judgments against "the first transferee of the asset" and other persons).

[19] The Trustee failed to address the Joint Defendants' arguments with respect to Counts II, IV, and V in her responsive brief, as well as their arguments with respect to her RICO Case Statement. Accordingly, the Joint Defendants argue that the Court should dismiss Counts II, IV, and V because of the Trustee's silence. Reply Mem. Supp. Mot. to Dismiss Am. Compl. ("Second Joint Reply") 20–21, ECF No. 69. The Court will not dismiss Counts II, IV, and V as unopposed because, as explained below, the Joint Defendants' arguments on the merits are baseless.

The Joint Defendants also argue that Counts II, IV, and V of the Amended Complaint should be dismissed because they are repeated "nearly *verbatim*" from the original Complaint, "which has already been found deficient in factual support regarding what specifically was transferred." *Id.* at 21. The Court will assess the sufficiency of the Amended Complaint on its merits. To the extent that the Trustee failed to supplement the allegations of the original Complaint as they relate to the fraudulent transfer claims, she did so at the risk that the Court will once again dismiss her claims.

- 39 -

In addition, claims of constructive fraud are not subject to the heightened pleading

standard of Rule 9(b) because "fraud does not have to be proven" thereunder. *Rocky Mountain*

*Holdings*, 2009 WL 564437, at *9 (citing *Bratek v. Beyond Juice, LLC*, No. Civ.A. 04-4491,

2005 WL 3071750, at *6 (E.D. Pa. Nov. 14, 2005)); *see also In re Transcon. Refrigerated Lines,*

*Inc.*, 438 B.R. 520, 522 (Bankr. M.D. Pa. 2010) (citing *In re Charys Holding Co., Inc.*, Bankr.

No. 08-10289, Adv. No. 10-50204, 2010 WL 2774852, at *3 n.2 (Bankr. D. Del. July 14, 2010))

(observing that "most Courts in the Circuit recognize that constructive fraudulent transfer claims

are not analyzed under the heightened Rule 9(b) pleading standard" and accordingly declining to

apply the standard). *But see In re Harris Agency, LLC*, 465 B.R. 410, 417 n.12 (Bankr. E.D. Pa.

2011) (observing that the Third Circuit has not ruled on whether the heightened pleading

standard applies to constructive fraud causes of action). The Court will address the Joint

Defendants' arguments in turn.[20]

---

[20] The Joint Defendants further argue that the Trustee "cannot now claim that [the Debtor] was unaware of the transfers" or that the transfers were concealed from the Debtor because the alleged transfers were made by all of the Debtor's shareholders, from whom the Debtor cannot be distinguished. Second Joint Mot. 31. However, they fail to explain why those factors bar the Trustee from asserting fraudulent transfer claims. To the extent that they deny that the Trustee pleaded the third badge of fraud listed in PUFTA section 5104(b), their argument fails because the actual intent standard addresses whether the transfers are fraudulent "as to a *creditor*" of the Debtor. PUFTA § 5104(a) (emphasis added).

Although the Joint Defendants assert the affirmative defense of *in pari delicto* to other counts of the Amended Complaint, it is not clear whether they intend to assert that defense to the fraudulent transfer claims. The defense of *in pari delicto* will be discussed in greater detail below. Briefly, "the doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001) (citing *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick, & Cabot*, 458 A.2d 545, 548–49 (Pa. Super. Ct. 1983)). To the extent that the Joint Defendants intended to raise the affirmative defense of *in pari delicto* in connection with the fraudulent transfer claims, however, it is clear that the defense would not apply because it can only be raised in defense to a claim brought by a trustee on behalf of a debtor pursuant to § 541. Here, the trustee filed the state fraudulent transfer claims pursuant to § 544 on behalf of the Debtor's creditors, not the Debtor. *In re David Cutler Indus., Ltd.*, 502 B.R. 58, 72 (Bankr. E.D. Pa. 2013).

Moreover, to assert the *in pari delicto* defense, the Joint Defendants must impute DiPalma and Recchia's actions to the Debtor. However, the imputation of an agent's wrongdoing to its principal, also discussed in greater detail below, is a defense to claims by the agent's principal based on such wrongdoing that is only available to third parties, not to agents. Restatement (Third) of Agency § 5.04 cmt. b. (Am. Law Inst. 2006). The Court therefore declines to dismiss the Trustee's fraudulent transfer claims on these grounds.

1.    The Actual Intent Standard

The actual intent standard applicable in this action is set forth in PUFTA section

5104(a)(1). Under section 5104(a)(1), any transfer made by a debtor is fraudulent if it is made

"with actual intent to hinder, delay or defraud any creditor of the debtor." PUFTA § 5104(a)(1).

Although it is ordinarily the debtor's intent as transferor that is examined under section

5104(a)(1), the Amended Complaint alleges that DiPalma and Recchia as transferees intended

"to hinder, delay and/or defraud [the Debtor's] creditors." Am. Compl. ¶ 236. However, the

modicum of intent required under section 5104(a)(1) may be imputed to the Debtor as transferor

from DiPalma and Recchia as transferees if they dominated or controlled the Debtor's

disposition of its property.[21]

---

[21] *See In re Elrod Holdings Corp.*, 421 B.R. 700, 710 (Bankr. D. Del. 2010) (adopting, with respect to Bankruptcy Code § 548(a)(1)(A), a three part imputation test); *In re Pinto*, 89 B.R. 486, 499 (Bankr. E.D. Pa. 1988) (citing 4 *Collier on Bankruptcy* ¶ 548.02 (15th ed. 1988)) (stating, with respect to § 548(a)(1)(A), that the transferee's intent to defraud the debtor's creditors may be imputed to the debtor-transferor "[o]nly when a transferee," typically an officer or insider of the debtor transferor, "is in a position to dominate or control the debtor's disposition of the property"), *decision supplemented*, 98 B.R. 200 (Bankr. E.D. Pa. 1989), *rev'd on other grounds sub nom. Pinto v. Phila. Fresh Food Terminal Corp.*, Civ. A. No. 89-3233, 1989 WL 234516 (E.D. Pa. Aug. 25, 1989); *In re Purco*, 76 B.R. 523, 529 (Bankr. W.D. Pa. 1987) (first quoting 4 *Collier on Bankruptcy* ¶ 548.02 (15th ed. 1985); then quoting *In re Vaniman Int'l, Inc.*, 22 B.R. 166 (Bankr. E.D.N.Y. 1982)) (stating, with respect to a predecessor to PUFTA section 5104(a)(1) that if "the transferee was an officer or was an agent . . . of an embarrassed corporate transferor" and was "in a position to dominate or control the debtor's disposition of [its] property," then the transferee's intent to defraud the debtor's creditors may be imputed to the debtor).

The Court notes that Bankruptcy Code § 548(a)(1)(A) and PUFTA section 5104(a)(1) were each derived from Uniform Fraudulent Conveyance Act ("UFCA") section 7. *See* 5 *Collier on Bankruptcy* ¶ 548.01[4] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) (stating that the UFCA is an "integral part of fraudulent transfer avoidance under the Bankruptcy Code" such that "[c]ases decided under the UFCA . . . are considered to be persuasive authority for similar issues arising under section 548 of the Code."); *id.* ¶ 548.04 (stating that, with respect to § 548(a)(1)(A), "[s]imilar provisions exist under the state uniform statues" such as UFCA section 7); PUFTA § 5104 cmt. 1 (stating that section 5104(a)(1) "is derived from § 7 of the Uniform Fraudulent Conveyance Act"). Cases interpreting the imputation of the transferee's intent to the transferor under § 548(a)(1)(A) are therefore instructive of the same issue under section 5104(a)(1). *See In re Wettach*, 811 F.3d 99, 107 (3d Cir. 2016) ("We see no reason to treat the PUFTA differently than the Bankruptcy Code, particularly since claims under the former statute are likely to arise in proceedings governed by the latter."); Monaco, *A Practitioner's Primer*, *supra*, at 29 (first citing *In re Int'l Auction & Appraisal Servs. LLC*, 493 B.R. 460, 468 (Bankr. M.D. Pa. 2013); then citing *In re C.F. Foods, L.P.*, 280 B.R. 103, 115 n.27 (Bankr. E.D. Pa. 2002)) (footnote omitted) (observing that "[t]he definition of actual fraud set forth in Section 5104(a)(1) is identical to the definition set forth in Section 548(a)(1)(A) of the Bankruptcy Code. Accordingly, courts strive to maintain uniformity in the interpretation of the two statutes").

DiPalma and Recchia's intent will be imputed to the Debtor for the purposes of section 5104(a)(1) if (1) they dominated or controlled the Debtor, (2) with respect to the disposition of its Assets, and (3) intended to hinder, delay, or defraud its creditors. *In re Elrod Holdings Corp.*, 421 B.R. 700, 710 (Bankr. D. Del. 2010) (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 443 (S.D.N.Y. 2001)). According to the Trustee's allegations, DiPalma and Recchia undisputedly controlled and dominated the Debtor with respect to the disposition of its Assets as its controlling officers and directors at the time of the transfers. Am. Compl. ¶¶ 9–10, 34–37. They were President and CEO, and Vice President of the Debtor, respectively; collectively owned an 80% interest in the Debtor; and "exclusively controlled" the Debtor until the Trustee's appointment on October 15, 2012. *Id.* DiPalma and Recchia's intent relative to the transfers at issue may therefore be imputed to the Debtor if they intended to hinder, delay, or defraud its creditors.

"[T]he intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof." Unif. Fraudulent Transfer Act, Prefatory Note (Unif. Law Comm'n 1984). Therefore, to determine whether DiPalma and Recchia transferred the Debtor's Assets in order to hinder, delay, or defraud its creditors, "consideration may be given" to a number of enumerated factors, or "badges of fraud." PUFTA § 5104(b) & cmt. 5. Those factors include, but are not limited to, whether the transfer was to an "insider"; the transfer was "concealed"; the transfer comprised "substantially all the debtor's assets"; the Debtor "removed or concealed assets"; the Debtor did not receive "reasonably equivalent" value in exchange for the transfer; and the Debtor "became insolvent shortly after the transfer was made." *Id.* §§ 5104(b)(1), (3), (5), (7)–(9). As explained below, the Trustee alleges at least these six badges of fraud to support her claim under the actual intent standard.

The Trustee's allegations satisfy the first badge of fraud: that the transfers were made from the Debtor to its insiders. Although PUFTA does not define what constitutes an insider, it directs that the term "should be interpreted in a common-sense way, consistent with Comments (5) and (6) to 12 Pa.C.S. § 5104." *Id.* § 5101 cmt. 12. Comments (5) and (6) to section 5104 primarily refer to "closely related person[s]." *Id.* § 5104 cmt. 5; *see also id.* § 5104 cmt. 6 (citing multiple cases referring to family members as insiders). However, Comment (6) cites one case that refers to a "dummy corporation" as an insider of an individual debtor and another case that refers to an assignee corporation that had "identical directors and stockholders" as its assignor corporation as an insider of the latter. *Id.* § 5104 cmt. 6.

According to the Amended Complaint, DiPalma—as President, CEO, and a director of the Debtor—and Recchia—as Vice President and a director of the Debtor—caused the Debtor to transfer its Assets to themselves. Am. Compl. ¶¶ 34, 37, 236. The Court therefore concludes that DiPalma and Recchia are insiders of the Debtor pursuant to PUFTA's "common sense" approach. *See In re Zambrano Corp.*, 478 B.R. 670, 692 (Bankr. W.D. Pa. 2012) (citing 11 U.S.C. § 101(31)(B)) (concluding that, as it is used in PUFTA section 5104, "the term 'insider' includes, if the debtor is a corporation, *a director, officer, or general partner of the debtor, [or] a person in control of the debtor*" even though the "relationship may not precisely satisfy the statutory definition of 'insider'") (emphasis added).

The Trustee's allegations also satisfy the third badge of fraud: that the transfers were concealed. As explained above, to hide the transfers from the Debtor's accounting books and records, DiPalma and Recchia allegedly caused the Debtor to hire an accountant to falsify its QuickBooks entries. Am. Compl. ¶ 113. To prevent the Debtor's creditors from discovering the transfers, DiPalma and Recchia allegedly transmitted various communications to the Debtor's

- 43 -

creditors that the Debtor (1) had no assets, (2) would cease operations, and (3) would make various payments when it collected certain accounts receivables. *Id.* ¶ 65. To prevent the transfers from surfacing in their individual bankruptcies, DiPalma and Recchia allegedly omitted from their petitions any reference to the transfers or to the Debtor's resulting legal claims. *Id.* ¶¶ 116–20. Similarly, to prevent the transfers from surfacing in the Debtor's bankruptcy, DiPalma and Recchia allegedly perjured themselves at the Debtor's 341 Meeting. *Id.* ¶ 173.

The Trustee's allegations further satisfy the fifth, seventh, eighth, and ninth badges of fraud. As explained above, the transfers allegedly comprised "substantially all" of the Debtor's Assets; the Assets were allegedly removed from the Debtor's premises to various locations, including DiPalma's house; the Debtor allegedly received "no consideration or inadequate consideration" and "did not receive a reasonably equivalent value in exchange"; and the Debtor allegedly became "insolvent solely as a result" of the transfers. *Id.* ¶¶ 68(b), 70(c), (f), 237. The Trustee's allegations that the Debtor was forced to discontinue its operations, carry debts in excess of its assets, and default on $2 million in financial obligations after the transfers further evidence that the transfers comprised substantially all of the Debtor's Assets and left the Debtor insolvent. *Id.* ¶¶ 68(c), 72–73.

Accepting the foregoing nonconclusory allegations as true and making all reasonable inferences therefrom in favor of the Trustee, she plausibly alleges that DiPalma and Recchia caused the Debtor to transfer its Assets to themselves with actual intent to defraud its creditors.[22] Based on the circumstances of the alleged transfers, it is plausible that they occurred within, and

---

[22] With respect to the Trustee's actual intent claim, the Amended Complaint plainly satisfies the requirement that intent be alleged generally. *See* Am. Compl. ¶ 236 (alleging that DiPalma and Recchia effected the transfers "with actual intent to hinder, delay and/or defraud [the Debtor's] creditors"). DiPalma and Recchia do not contend otherwise.

pursuant to, an elaborate scheme by DiPalma and Recchia to leverage the Debtor's resources to

establish profitable businesses and then fraudulently divert the Debtor's Assets to themselves. As

a result of the alleged scheme, the Defendants enjoyed the benefits of the businesses, but the

Debtor and its creditors were burdened with the debts incurred to establish the businesses. The

Court therefore concludes that the Amended Complaint sets forth a plausible claim against

DiPalma and Recchia under the actual intent fraudulent transfer standard. *Cf. In re Covenant*

*Partners, L.P.*, 531 B.R. 84, 91–92 (Bankr. E.D. Pa. 2015) (concluding that a complaint stated a

claim to set aside a transfer as actually fraudulent where it alleged at least four badges of fraud).

Pursuant to Rule 9(b), the Joint Defendants also argue that the Amended Complaint

insufficiently described "what was transferred, the date, time and method of the transfer, or the

precise value of the transfer." Second Joint Mot. 31–32. With respect to what was transferred,

they essentially argue that the Trustee should have individually identified each of the Debtor's

Assets that were transferred. *See id.* at 23, 32 (complaining, in the context of the Trustee's RICO

allegations, that she "fail[ed] to identify any" specific trademark, patent, copyright, work-in-

progress, or piece of office equipment that was transferred and instead referenced such transfers

in "generic terms"; and in the context of the Trustee's fraudulent transfer allegations that she

provided neither "a basic description" of the Debtor's "unique intellectual property" nor public

records necessary to establish the Debtor's right to such property).

DiPalma and Recchia drastically understate the particularity of the allegations set forth by

the Trustee in the Amended Complaint. With respect to what was transferred, the Trustee alleges

that the Assets included, but were not limited to, the Debtor's

> unique intellectual property and inventory; accounts receivables; contracts for retail
> orders and manufacturing; works-in-progress; product designs; plans; models;
> drawings; servers; computers; computer files; financial records; production

- 45 -

> records; commercial printing equipment; advertising materials; business leads;
> [and] information about business relationships.

Am. Compl. ¶ 68(a). Furthermore, the Trustee specifically identified in Exhibit D five product

lines that the Debtor developed, but that WeVeel later marketed as its own. *Id.* ¶ 280. Finally, a

former employee of the Debtor claims that "almost all of the products" advertised by WeVeel in

2011 were developed by the Debtor and its employees. *Id.* ¶ 281. Certainly this enumeration

sufficiently describes "what" DiPalma and Recchia are accused of fraudulently transferring.

Moreover, many of the details of the fraudulent transfers are allegedly unavailable to the

Trustee. The Trustee claims that DiPalma and Recchia took "actions to fraudulently conceal their

wrongdoing" and "created an insuperable barrier to [the Debtor] acquiring the knowledge and

resources necessary to bring [this] suit." *Id.* ¶ 9. The alleged accounting fraud, pursuant to which

the Debtor's records were revised "so as to falsely understate [the Debtor's] assets, overstate [its]

liabilities and otherwise modify the entries to be intentionally vague, incomplete and misleading"

constitutes potentially the greatest obstacle to the Trustee. *Id.* ¶ 113. As a result, with respect to

what was transferred, the Trustee "expect[s] that discovery will provide additional . . .

information." *Id.* ¶ 282. Under such circumstances, the Court does not expect the Trustee to

possess precise details regarding what was transferred. The Trustee's description of the

transferred Assets accordingly does not run afoul of Rule 9(b).

With respect to the value exchanged for the transfers, the Joint Defendants argue that the

Amended Complaint merely alleges that the Debtor "did not receive a reasonabl[y] equivalent

value in exchange" without describing how the value was not reasonably equivalent. Second

Joint Mot. 32 (quoting Am. Compl. ¶ 237). It is true that the Trustee does not precisely identify

the value that was exchanged for the transfers. *See* Am. Compl. ¶ 237 (alleging that "no

consideration or inadequate consideration" was exchanged and that the Debtor "did not receive a

reasonably equivalent value in exchange"). However, in light of the alleged accounting fraud, the

Court does not expect the Trustee to possess precise details of the value exchanged for the

transfers either and it is sufficient that she alleged that absolutely no consideration was

exchanged.

Finally, with respect to the date, time, and method of the transfer, the Joint Defendants do

not elaborate on how the Amended Complaint fails to meet this pleading standard. In the Court's

judgment, the Trustee described the occasion and method of the fraudulent transfers with

sufficient particularity. *See* Am. Compl. ¶ 68 (alleging that the transfers occurred in November

2009 when DiPalma, Recchia, and others physically removed the Assets from the Debtor's

former offices in Morrisville, Pennsylvania). The Court therefore concludes that, under the

relaxed application of Rule 9(b), the Amended Complaint sufficiently describes the claims

against DiPalma and Recchia with respect to their alleged actual intent under PUFTA section

5104(a)(1).

## 2.     The Constructive Fraud Standards

The constructive fraud standards applicable in this action are set forth in PUFTA sections

5104(a)(2) and 5105. Under the former, a transfer by the Debtor is fraudulent as to its creditors if

the Debtor did not receive "reasonably equivalent value in exchange for the transfer" and

> (i) was engaged or was about to engage in a business or a transaction for which the
> remaining assets of the debtor were unreasonably small in relation to the business
> or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that the debtor
> would incur, debts beyond the debtor's ability to pay as they became due.

PUFTA § 5104(a)(2). Under the latter, a transfer by the Debtor is fraudulent as to its creditors if

the Debtor did not receive "reasonably equivalent value in exchange for the transfer" and "was

insolvent at that time or . . . became insolvent as a result of the transfer." *Id.* § 5105.

Whether the Debtor received reasonably equivalent value under either standard depends first on "whether the debtor received 'any value at all' from the challenged transaction" and second on "whether the value received was 'roughly the value it gave.'" *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 387 (E.D. Pa. 2013) (first quoting *R.M.L., Inc.*, 92 F.3d at 149; then quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212–13 (3d Cir. 2006)). "Value," in turn, is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor." *Id.* (quoting 11 U.S.C. § 548(d)(2)(A)). Here, the analysis stops at the first step because, as explained above, the Trustee alleged that the Debtor received absolutely "no consideration" in exchange for the transfers. Am. Compl. ¶ 237. The Amended Complaint therefore satisfies the constructive fraud standards with respect to the value that the Debtor received in exchange for the transfers.

The section 5104(a)(2)(i)–(ii) tests "address[] slightly different aspects of the same fundamental inquiry: whether the debtor is and, on a continuing basis, will be able to pay its debts as they become due." PUFTA § 5104 cmt. 4. The subsection (a)(2)(i) test

> focuses attention on whether the amount of all the assets retained by the debtor was inadequate, i.e., unreasonably small, in light of the needs of the business or transaction in which the debtor was engaged or about to engage (and hence taking into account, among other things, the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due).

*Id.* Therefore, the question is not whether the Debtor *actually* was not timely paying his debts. *Id.* Instead, the inquiry looks to the Debtor's "ability" to pay his debts and his "intentions and beliefs with respect to such ability . . . on a continuing basis now and in the future." *Id.*; *see also Rocky Mountain Holdings*, 2009 WL 564437, at *10 (denying a motion to dismiss constructive fraud claims in part because the defendant "could have reasonably anticipated a tax liability . . . that

exceeded the amount of money it retained after . . . the challenged transfers" and that arose five
months after the transfers).

The Trustee alleges that, as a result of the transfers, DiPalma and Recchia "attempted to
and did abandon [the Debtor] saddled with debt, but in no position to pay its creditors as [its]
debts became due." Am. Compl. ¶ 68(d). The Amended Complaint therefore facially satisfies
section 5104(a)(2)(i).

In addition, the Trustee's allegations regarding the circumstances of the alleged transfers
and whether such transfers would leave the Debtor with unreasonably few assets relative to the
needs of its business also satisfy section 5104(a)(2)(ii). As explained above, the Trustee alleged
that DiPalma and Recchia transmitted various communications to the Debtor's creditors that it
(1) had no assets, (2) would cease operations, and (3) would make various payments when it
collected certain accounts receivables. *Id.* ¶ 65. The plausible inference from the Trustee's
allegations is that DiPalma and Recchia reasonably believed that the transfers would leave the
Debtor with unreasonably few assets and that they therefore intended the communications to
conceal the transfers from its creditors. *See id.* (concluding that the communications were
intended to "create a window for DiPalma and Recchia to divert, convert and steal [the Debtor's]
valuable property and business"). Moreover, if the transfers comprised "substantially all" of the
Debtor's Assets and the Debtor received absolutely "no consideration" in exchange therefor, as
the Trustee alleged, *id.* ¶ 70(c), (e), then the transfers must have left the Debtor with
unreasonably few assets. Accepting the foregoing nonconclusory allegations as true and making
all reasonable inferences therefrom in favor of the Trustee, the Amended Complaint therefore
plausibly states a claim under section 5104(a)(2).

The section 5105 test addresses "balance sheet insolvency," pursuant to which "[a] debtor is insolvent if, at fair valuations, the sum of [its] debts is greater than all of [its] assets."[23] PUFTA § 5102(a) & cmt. 1. Because PUFTA neither defines "fair valuation" nor specifies a corresponding method of valuation, "different methods of determining value on any particular basis may be appropriate" in different circumstances. *Id.* § 5102 cmt. 1. In the absence of "specific financial information," for example, the Court may "reasonably infer" insolvency from other facts. *See Covenant Partners*, 531 B.R. at 93 (concluding that various oral and written communications concerning a debtor's financial condition "suffice for alleging insolvency").

As explained above, the Trustee alleges facts that support the inference that the Debtor became insolvent as a result of the transfers. *See* Am. Compl. ¶¶ 68(c)–(d), 70(c), (e), 73 (alleging that the transfers comprised "substantially all of [the Debtor's] assets," were made in exchange for absolutely "no consideration," left the Debtor "saddled with debt," and caused the Debtor to "cease all operations as a going concern" and default on approximately $2 million in debts to its creditors). Such an inference is consistent with the greater purpose that the Trustee attributes to DiPalma and Recchia's actions: to leverage the Debtor's "ability to borrow money . . . its creditworthiness, as well as [its] cash flow" to build the Debtor's toy and craft division and then divert it and the Debtor's graphic design division to themselves. *Id.* ¶¶ 44–45, 78, 91. Accepting the foregoing nonconclusory allegations as true and making all reasonable inferences therefrom in favor of the Trustee, the Amended Complaint therefore plausibly states a claim under section 5105.

---

[23] "Asset[s]" are defined as the "[p]roperty of a debtor." PUFTA § 5101(b). However, "property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer fraudulent under [PUFTA]" is excluded. *Id.* § 5102(d).

### D.    Count III: Conversion Claims Against DiPalma and Recchia

The Trustee raises a cause of action for conversion of the Debtor's Assets against

DiPalma and Recchia in Count III of the Amended Complaint. Am. Compl. ¶¶ 240–45. This

cause of action is an alternative to the fraudulent transfer claims that the Trustee sets forth in

Count II.[24] Under Pennsylvania state law, conversion consists of (1) "the deprivation of another's

right of property, or use or possession of a chattel, or other interference therewith"; (2) "without

the owner's consent"; and (3) "without legal justification." *Eagle v. Morgan*, Civ. A. No. 11-

4303, 2013 WL 943350, at *10 (E.D. Pa. Mar. 12, 2013) (quoting *Universal Premium*

*Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995)). The Trustee alleges

that DiPalma and Recchia "stole and took personal possession of the [Debtor's Assets]" with

"fraudulent intent" and "without [the Debtor's] consent." Am. Compl. ¶ 242. As a result, the

Debtor was "wrongfully deprived" of "its right to use, possess, control and enjoy the benefits of

the [Assets]." *Id.* ¶ 243.

In response, the Joint Defendants argue that the alleged conversion must be imputed to

the Debtor because the conversion was part of an elaborate scheme of fraud involving DiPalma,

Recchia, and Stromberg, who collectively comprised 100% of the Debtor's shareholders.[25]

Second Joint Mot. 33–34 (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,

267 F.3d 340, 359 (3d Cir. 2001); *Field v. Lew*, 184 F. Supp. 23, 27 (E.D.N.Y. 1960), *aff'd sub*

---

[24] Under Federal Rule of Civil Procedure 8(d)(2), "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2). This rule is applicable in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7008.

[25] The Joint Defendants also assert that "[a]t the very best, the Trustee attempts to bring a derivative shareholder action. However, the Trustee has no right to bring such an action." Second Joint Mot. 34. The Joint Defendants, however, provide no legal or factual support for their assertion and, as explained above, the Trustee is authorized to assert this cause of action on behalf of the Debtor under § 541 if it is one that the Debtor possessed at the commencement of the bankruptcy case.

*nom. Field v. Bankers Tr. Co.*, 296 F.2d 109 (2d Cir. 1961)). The Joint Defendants conclude that

the cause of action must therefore be dismissed because "one cannot convert one's own

property." *Id.* at 34. Essentially, they assert the affirmative defense of *in pari delicto*, which they

also asserted as a defense to Count I of the Amended Complaint.[26] *Id.* at 21–22.

In response, the Trustee argues that DiPalma and Recchia's conduct should not be

imputed to the Debtor for the purposes of *in pari delicto* for numerous reasons. First, the Trustee

argues that "[s]ince *in pari delicto* is an affirmative defense, it usually should not be raised in a

motion to dismiss." Resp. to Second Joint Mot. 41 (citing *Matlack Leasing, LLC v. Morison*

*Cogen, LLP*, Civ. A. No. 09-1570, 2010 WL 114883 (E.D. Pa. Jan. 13, 2010)). The Trustee also

argues that imputation is inappropriate based on the "adverse interest" exception and that the

"sole actor" exception to the adverse interest exception is inapplicable. *Id.* at 42–45 (first quoting

*Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 495 (3d Cir. 2013); then quoting *Allegheny*

*Health III*, 989 A.2d at 332–33, 332 n.25).[27]

---

[26] "[T]he application of the *in pari delicto* doctrine is affected by the rules governing bankruptcies." *Lafferty*, 267 F.3d at 356. The Trustee is the representative of the Debtor's estate and "has capacity to sue and be sued" on behalf of the estate. 11 U.S.C. § 323; Fed. R. Bankr. P. 6009. The Trustee may therefore assert the legal or equitable causes of action that inure to the estate under Bankruptcy Code § 541. *Lafferty*, 267 F.3d at 356. The Trustee may only assert causes of action that the Debtor possessed at the commencement of the bankruptcy case, however, because she "stands in the shoes of the debtor." *Id.* (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989)).

With respect to the causes of action that the Trustee asserts on behalf of the Debtor, however, any defenses that may have been asserted against the Debtor may also be asserted against the Trustee. *Id.* (quoting *Hays & Co.*, 885 F.2d at 1154). The Joint Defendants may therefore assert *in pari delicto* as a defense to the Trustee's cause of action for conversion. *See id.* at 357–58 (quoting *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d 1281, 1285–86 (10th Cir. 1996)) (concluding that although the Official Committee of Unsecured Creditors was an "innocent successor" to the debtor, it was not insulated from the defenses applicable to the debtor in causes of action the Committee asserted under § 541).

[27] The Trustee further argues "that imputation would contravene 'traditional schemes governing liability in contract and in tort, including fair compensation and deterrence of wrongdoing.'" Resp. to Second Joint Mot. 52–53 (quoting *Allegheny Health III*, 989 A.2d at 332). The Trustee finally argues that the same social policies underlying the "adverse domination tolling theory" make the application of *in pari delicto* in this case "unacceptable from a public policy perspective." *Id.* at 53–54 (quoting *In re O.E.M./Erie, Inc.*, 405 B.R. 779, 786 (Bankr. W.D. Pa. 2009)).

- 52 -

*In pari delicto* is "derive[d] from the Latin maxim, *in pari delicto potior est conditio defendentis*, which means: 'In a case of equal or mutual fault . . . the position of the party . . . [defending] is the better one.'" *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 (3d Cir. 1990) (quoting Black's Law Dictionary 711 (5th ed. 1979)). The doctrine was fashioned to ensure that courts do not "lend their good offices to mediating disputes among wrongdoers" and to serve as "an effective means of deterring illegality." *Id.* (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)).

To successfully assert *in pari delicto*, the Joint Defendants must show that the Debtor was "an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear 'substantially equal [or greater] responsibility for the underlying illegality' as compared to the defendant." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 329 (Pa. 2010) [hereinafter *Allegheny Health III*] (quoting *McAdam*, 896 F.2d at 756–57). The doctrine, however, "permits matters of public policy to be taken into consideration in determining the defense's availability in any given set of circumstances." *Id.* at 330 (citing *Bateman Eichler*, 472 U.S. at 307, 310).

Whether the Debtor is responsible for the alleged misconduct "is complicated by the fact that [corporations] must act through their agents." *Id.* at 330 n.20, 333. Therefore the imputation of DiPalma and Recchia's misconduct to the Debtor "is a linchpin" to the application of *in pari delicto*. State law generally governs the substantive law of imputation as applied to state law claims. *Lafferty*, 267 F.3d at 358.

"Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." *In re Lemington Home for Aged*, 659 F.3d 282, 293 (3d Cir. 2011) (quoting

- 53 -

*Lafferty*, 267 F.3d at 358), *mandamus denied sub nom. In re Baldwin*, 700 F.3d 122 (3d Cir.

2012). Accordingly, "principals generally are responsible for the acts of agents committed within

the scope of their authority." *Allegheny Health III*, 989 A.2d at 333 (citing *Todd v. Skelly*, 120

A.2d 906, 909–10 (Pa. 1956); *Gordon v. Cont'l Cas. Co.*, 181 A. 574, 577–78 (Pa. 1935)). The

justification to impute to the principal its agent's actions is that "it is the principal who has

selected and delegated responsibility to those agents; accordingly, the doctrine creates incentives

for the principal to do so carefully and responsibly." *Id.* (citing *Aiello v. Ed Saxe Real Estate,

Inc.*, 499 A.2d 282, 285–86 (Pa. 1985)). Imputation therefore "protect[s] those who transact

business with a corporation through its agents believing the agent's conduct is with the authority

of his principal." *Id.* (citing *Aiello*, 499 A.2d at 285).

　　　The Third Circuit has recognized an exception to the imputation doctrine known as the

"adverse interest" exception which prohibits imputation "where an agent acts in his own interest,

and to the corporation's detriment." *Belmont*, 708 F.3d at 495. In addition, the adverse interest

exception is subject to a limited exception known as the "sole actor" exception which is only

applied "to cases in which the agent who committed the fraud was the sole shareholder of the

corporation or dominated the corporation." *Thabault v. Chait*, 541 F.3d 512, 529 (3d Cir. 2008)

(concluding that the sole actor exception did not apply in that case because the agents owned

only 65% of the principal's stock).

　　　Although an affirmative defense typically is not considered on a motion to dismiss, it

may be if it "is established on the face of the complaint." *Leveto v. Lapina*, 258 F.3d 156, 161

(3d Cir.2001) (quoting *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996)). Here, the

affirmative defense of *in pari delicto* has not been established on the face of the Amended

Complaint because the Trustee has alleged facts which support the application of the adverse

interest exception to the imputation doctrine—namely, that DiPalma and Recchia's conduct in converting the Debtor's Assets adversely affected the Debtor and only conferred benefits on DiPalma and Recchia. In addition, it does not appear on the face of the Amended Complaint that the sole actor exception applies to invalidate the adverse interest exception because the Debtor's agents, DiPalma and Recchia, owned only 80% of the Debtor's stock.[28]

Finally, and perhaps most importantly, the Court notes that "imputation rules justly operate to protect *third parties* on account of their reliance on an agent's actual or apparent authority." *Allegheny Health III*, 989 A.2d at 336 (emphasis added) (citing *Travelers Cas. & Sur. Co. v. Castegnaro*, 772 A.2d 456, 460 (Pa. 2001)). Imputation therefore "does not furnish a basis on which an agent may defend against a claim by the principal," rather it "is applicable only for purposes of determining a principal's legal relations with a third party." Restatement (Third) of Agency § 5.04 cmt. b. (Am. Law Inst. 2006).

For the foregoing reasons, the Joint Defendants may not avail themselves of the affirmative defense of *in pari delicto* with respect to the Trustee's conversion claims. Because the Joint Defendants fail to articulate any other objection to the Trustee's substantive allegations and the Trustee's allegations plausibly state a claim for conversion, the Court will deny the Second Joint Motion as to Count III of the Amended Complaint.

### E.    Counts IV–V: Fraudulent Transfer Claims Against WeVeel and Junto

Counts IV–V of the Amended Complaint assert fraudulent transfer claims to recover the Debtor's toy and craft division related Assets and graphic design division related Assets that

---

[28] The Joint Defendants argue that the sole actor exception applies because 100% of the Debtor's shareholders participated in the alleged fraudulent scheme. Second Joint Mot. 33–34. The Trustee, however, did not allege that Stromberg participated in the fraudulent transfer and/or conversion of the Debtor's Assets. Am. Compl. ¶ 68. Rather, the only part of the alleged fraudulent scheme in which the Trustee alleged Stromberg participated was the Debtor's fraudulent invoicing practices. *Id.* ¶ 59.

DiPalma and Recchia allegedly transferred to WeVeel and Junto, respectively. Am. Compl.

¶¶ 82, 94, 246–59. PUFTA sections 5104–05 pertain only to "transfer[s] made . . . by a debtor."

Once a cause of action is established thereunder, the available remedies are set forth in section

5107, and the individuals against whom the remedies may be invoked are set forth in section

5108. The remedies are cumulative and include

> (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.
>
> (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law.
>
> (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
>
> > (i) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
> >
> > (ii) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
> >
> > (iii) any other relief the circumstances may require.

PUFTA § 5107(a) & cmt. 6. Judgment "to the extent a transfer is voidable in an action . . . under

section 5107(a)(1)" is available against "the first transferee of the asset or the person for whose

benefit the transfer was made" and also against "any subsequent transferee." *Id.* § 5108(b).

The Trustee does not allege that DiPalma and Recchia defrauded their creditors when

they transferred the Debtor's Assets to WeVeel and Junto. Counts IV and V of the Amended

Complaint therefore do not assert independent causes of action for those transfers, but seek

judgments against WeVeel and Junto as subsequent transferees of the transfers underlying Count

II. Accordingly, the Trustee alleges that DiPalma and Recchia's transfers to WeVeel and Junto

were entered into "with actual intent to hinder, delay and/or defraud [the Debtor's] creditors";

"in bad faith because all of the participants . . . had sufficient knowledge to place them on

- 56 -

inquiry of the voidability of the . . . transaction"; and "for no consideration or inadequate

consideration." Am. Compl. ¶¶ 249–51, 256–58.

The Joint Defendants raise virtually the same arguments to dismiss the fraudulent transfer

claims against WeVeel and Junto as they did with regard to the alleged fraudulent transfer claims

against DiPalma and Recchia. Second Joint Mot. 30–33. As explained above, those arguments

fail. The Joint Defendants also argue, however, that the fraudulent transfer claims against

WeVeel and Junto should be dismissed because the Trustee's "factual basis for involving

WeVeel . . . . and Junto . . . because they knew or should have known" that the Debtor's initial

transfers to DiPalma and Recchia were fraudulent amount to mere "conclusory allegations . . .

which are not sufficient in defeating a 12(b)(6) motion." *Id.* at 32–33. In other words, the Joint

Defendants argue that WeVeel and Junto received the Debtor's Assets in good faith.

Section 5108(a) establishes that "[a] transfer . . . is not fraudulent under section

5104(a)(1) . . . against a person who took in good faith and for a reasonably equivalent value or

against any subsequent transferee." PUFTA § 5108(a). Although section 5108(a) neglects to

expressly delegate the burden of proof between the plaintiff and the transferee, it is well

established that section 5108(a) sets forth "an affirmative defense for which the transferee bears

the burden of proof." *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 391 (E.D. Pa.

2013) (citing *In re Lockwood Auto Grp., Inc.*, 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010)); *see*

*also* PUFTA § 5108 cmt. 1 (citing *Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F.

Supp. 276, 280 (D.N.J. 1948), *aff'd*, 172 F.2d 327 (3d Cir. 1949)) (stating that "[t]he person who

invokes this defense carries the burden of establishing good faith and the reasonable equivalence

of the consideration exchanged").

Section 5108(b)(2), with respect to a transfer that is avoidable under PUFTA, allows judgment to be entered against *any subsequent transferee* other than a good faith transferee who took for value." PUFTA § 5108(b) (emphasis added). Like section 5108(a), the burden of proof under section 5108(b)(2) is not expressly delegated. However, unlike section 5108(a), it is not well established whether the burden of proof under section 5108(b)(2) falls upon the plaintiff or upon the transferee. "No court appears to have addressed this specific issue under Pennsylvania law, but it has been assumed that 'subsequent transferees' are subject to the requirements of 'good faith' and 'reasonably equivalent value' under PUFTA." Gregory M. Monaco, *A Practitioner's Primer on the Pennsylvania Uniform Fraudulent Transfer Act*, Pa. B. Ass'n Q., Jan. 2015, at 18, 38 (citing *United States v. Rocky Mountain Holdings, Inc.*, Civ. A. No. 08-3381, 2009 WL 564437, at *8 (E.D. Pa. Mar. 4, 2009)) (examining whether the requirements of the affirmative defense set forth in section 5108(a)(1) apply to subsequent transferees and noting disagreements among courts in different jurisdictions).

"In 2014 the Uniform Law Commission approved a set of amendments to the Uniform Fraudulent Transfer Act" and "changed the title of the Act to the Uniform Voidable Transactions Act." Unif. Voidable Transactions Act, Prefatory Note (2014 Amendments) (Unif. Law Comm'n 2014). The amendments "address[ed] a small number of narrowly-defined issues, and w[ere] not a comprehensive revision" of the Uniform Fraudulent Transfer Act, *id.*, from which PUFTA was adopted by the Pennsylvania Bar Association, PUFTA § 5101 cmt. 1. As a result, "PUFTA will continue, by and large, to exist in its current form, and much of the case law interpreting PUFTA will not be disturbed." Monaco, *A Practitioner's Primer*, *supra*, at 18.

- 58 -

The Uniform Voidable Transactions Act added "uniform rules allocating the burden of proof . . . with respect to claims for relief and defenses under the Act."[29] Unif. Voidable Transactions Act, Prefatory Note (2014 Amendments). Section 8(g)(3) of the Uniform Voidable Transactions Act clarifies that "[t]he transferee has the burden of proving the applicability to the transferee" of the good faith exception set forth in § 8(b). *Id.* § 8(g)(3).[30] The comments to section 5108 support the conclusion that the burden of proof under subsection (b)(2) is delegated to the subsequent transferee.[31] Finally, there is precedent within the United States District Court for the Eastern District of Pennsylvania that section 5108(b)(2) is an affirmative defense for which the subsequent transferee bears the burden of proof. *See United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 121–24 (E.D. Pa. 2011) (concluding that the defendant did

---

[29] The rules do not substantively change section 8(b), which sets forth the defenses available to subsequent transferees, but merely "clarify" its meaning. Unif. Voidable Transactions Act, Prefatory Note (2014 Amendments). As a result, section 8(b) of the Uniform Voidable Transactions Act and section 5108(b) of PUFTA remain substantially similar. *Compare id.* § 8(b) ("To the extent a transfer is avoidable in an action by a creditor under Section 7(a)(1) . . . judgment may be entered against . . . an immediate or mediate transferee of the first transferee, other than . . . a good-faith transferee that took for value . . . ."), *with* PUFTA § 5108(b) ("[T]o the extent a transfer is voidable in an action by a creditor under section 5107(a)(1) . . . judgment may be entered against . . . any subsequent transferee other than a good faith transferee who took for value . . . .").

[30] The delegation of the burden of proof to the transferee under section 8(g)(3) is an "integral element[] of the rights created by this Act." Unif. Voidable Transactions Act § 8 cmt. 8. The Uniform Voidable Transactions Act directs that the delegation "should apply if this Act is invoked in a bankruptcy proceeding pursuant to Bankruptcy Code § 544(b)" based on the "fundamental principle that property rights in bankruptcy should be the same as outside bankruptcy, unless a federal interest compels a different result." *Id.* (citing *Butner v. United States*, 440 U.S. 48, 55 (1979)).

[31] The comments state that PUFTA section 5108(b) "is derived from § 550(a) and § 550(b) of the Bankruptcy Code." PUFTA § 5108 cmt. 2. Bankruptcy Code § 550 prevents recovery from a subsequent transferee "that takes for value . . . in good faith, and without knowledge of the voidability of the [initial] transfer," but permits recovery against an initial transferee, regardless. 11 U.S.C. § 550(a)–(b). Bankruptcy Code § 550 also neglects to expressly delegate the burden of proof with respect to whether the subsequent transferee took in good faith and for value. However, "the better-reasoned position is that, once the trustee has avoided a transfer and established that the property has been transferred to an immediate or mediate transferee, the transferee has the burden." 5 *Collier on Bankruptcy* ¶ 550.03[5] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008).

In fact, Bankruptcy Code § 550(b) is widely considered to place the burden of proof on subsequent transferees. *See In re Nieves*, 648 F.3d 232, 237 (4th Cir. 2011) (citing cases from numerous jurisdictions including *In re Smoot*, 265 B.R. 128, 140 (Bankr. E.D. Va. 1999) and concluding that the subsequent transferee "claiming a defense to liability under § 550(b) bears the burden of proof.") The Third Circuit, however, has declined to decide whether the burden of proof under § 550 lies with the subsequent transferee. *See In re Bressman*, 327 F.3d 229, 236 n.2 (3d Cir. 2003).

not receive the transfer for value and therefore could not "*assert a defense* to judgment under 5108(b)(2)") (emphasis added).

Based on the foregoing, the Court concludes that PUFTA section 5108(b)(2) sets forth an affirmative defense and that the burden of proof thereunder lies with the subsequent transferee. As an affirmative defense, whether the transferee took in good faith under section 5108(b)(2) will justify dismissal of a complaint only if the defense "appears on its face." *Image Masters*, 489 B.R. at 391 (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001)). "When facts or matters outside of the complaint are necessary to establish the affirmative defense . . . raising it under Rule 12(b)(6) is usually not permitted." *Id.* (citing *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 (3d Cir. 2003)).

The term "good faith" is defined with respect to whether the transferee "acted without actual fraudulent intent and . . . did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor." PUFTA § 5108 cmt. 6. The Court analyzes such circumstances relative "to what the transferee objectively knew or should have known . . . not to the subjective knowledge or belief of the transferee." *Image Masters*, 489 B.R. at 391 (quoting *Lockwood Auto Grp.*, 428 B.R. at 636). Therefore, the affirmative defense set forth in section 5108(b)(2) may be unavailable even where the transferee lacked "actual knowledge" that the original transfer was fraudulent if it was "on inquiry notice" of "suspicious circumstances" that warranted "a diligent investigation." *Id.* (quoting *Lockwood Auto Grp*, 428 B.R. at 636).

The Trustee has alleged that DiPalma and Recchia own membership interests in WeVeel and Junto and that WeVeel and Junto "knew or had reason to believe that DiPalma and Recchia had obtained the [Debtor's Assets] in connection with the" alleged fraudulent scheme. Am. Compl. ¶¶ 82, 111, 250, 257. It is therefore impossible to conclude on the face of the Amended

Complaint that WeVeel and Junto received the transfers in good faith. Moreover, the Joint

Defendants have made no arguments in support of WeVeel and Junto's good faith, but have

merely argued that the Trustee has failed to prove their bad faith, which she is not required to do

in response to the motion to dismiss. Second Joint Mot. 30–33. The affirmative defense set forth

in section 5108(b)(2) is therefore inapplicable at this stage of the proceedings.

### F.    Counts VI–VII: Veil Piercing Claims Under the Single Entity Theory

Counts VI–VII of the Amended Complaint attempt to pierce the corporate veils of

WeVeel and Junto under the "single entity theory."[32] Am. Compl. ¶¶ 260–73. The Trustee

asserts that WeVeel, Junto, and the Debtor are a "single entity" such that WeVeel and Junto

should be "responsible for [the Debtor's] liabilities." *Id.* ¶¶ 260–73; Resp. to Second Joint Mot.

54–57. The Joint Defendants argue in response that "[t]he single entity theory has not yet been

adopted by the Commonwealth of Pennsylvania." Second Joint Mot. 35 (citing *In re LMcD,*

*LLC*, 405 B.R. 555, 564 (Bankr. M.D. Pa. 2009)).

It is true that the Pennsylvania Supreme Court has not yet decided whether to recognize

the single entity theory. In the absence of a decision by the highest court of the state, this Court

ordinarily would "don the soothsayer's garb and predict how that court would rule if it were

presented with the question." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267

F.3d 340, 349 (3d Cir. 2001) (citing *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 459 (3d

Cir. 1993)). The Court's analysis would examine "(1) what the Pennsylvania Supreme Court has

said in related areas; (2) the 'decisional law' of the Pennsylvania intermediate courts; (3) federal

appeals and district court cases interpreting the state law; [and] (4) decisions from other

---

[32] Trustees have standing to assert causes of action based on veil piercing theories because their "duty is to maximize the estate's recovery" and such causes of action may inure to the benefit of all of the creditors. *In re Mass*, 178 B.R. 626, 629–31, 629 n.4 (M.D. Pa. 1995). Here, the Trustee's veil piercing claims would benefit all of the Debtor's creditors.

- 61 -

jurisdictions that have discussed the issue we face here." *Gruber v. Owens-Illinois Inc.*, 899 F.2d 1366, 1369–70 (3d Cir. 1990).

The Pennsylvania Superior Court's opinion in *Miners, Inc. v. Alpine Equipment Corp.*, 722 A.2d 691 (Pa. Super. Ct. 1998), is the most significant opinion issued by a Pennsylvania state court that addresses the single entity theory. As a result, its analysis of whether and how the single entity theory would apply under Pennsylvania law is frequently cited by courts that confront the issue.

However, the overwhelming majority of such courts either declined to apply the single entity theory because it has not yet been adopted by the Pennsylvania Supreme Court or declined to predict whether it would be adopted because the plaintiff inadequately pleaded its elements.[33] In the case at hand, the Court adopts the latter approach because the Trustee has failed to plead at least one of the elements of the single entity theory.

---

[33] *See J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.*, Civ. A. No. 1:11-CV-1751, 2013 WL 3208586, at *4 (M.D. Pa. June 24, 2013) (declining "to determine whether Pennsylvania courts would recognize the single entity theory because [the plaintiff] fails to adequately plead its essential elements"); *Star Ins. Co. v. Reginella Constr. Co.*, No. 2:12-CV-01195, 2013 WL 1687854, at *5 & n.1 (W.D. Pa. Apr. 18, 2013) (observing that the single entity theory "is yet to be adopted in Pennsylvania" and that the plaintiff did not allege facts that "would allow [it] to attempt to pierce the corporate veil"); *Macready v. TCI Trans Commodities, A.G.*, Civ. A. No. 00-4434, 2011 WL 4835829, at *6–8 (E.D. Pa. Oct. 12, 2011) (declining to determine whether the Pennsylvania Supreme Court would adopt the single entity theory because the plaintiff failed to "present evidence . . . of involuntary creditor status"); *Gupta v. Sears, Roebuck & Co.*, Civ. A. No. 07-243, 2009 WL 890585, at *1–2 (W.D. Pa. Mar. 26, 2009) (declining to pierce the corporate veil under the single entity theory because the plaintiff failed to "offer any evidence . . . that the two corporations are a single entity or an integrated enterprise"); *Greenway Ctr., Inc. v. Essex Ins. Co.*, No. 3:04CV1143, 2008 WL 3165874, at *6 (M.D. Pa. Aug. 6, 2008) (declining to apply the single entity theory because it "has not yet been adopted under Pennsylvania law"), *vacated*, 369 F. App'x 348 (3d Cir. 2010); *Bouriez v. Carnegie Mellon Univ.*, No. Civ.A. 02-2104, 2005 WL 3006831, at *19–20 (W.D. Pa. Nov. 9, 2005) (declining to pierce the corporate veil under the single entity theory "because Pennsylvania has not adopted" the theory and because the plaintiff's arguments thereunder were "without merit"); *E-Time Sys., Inc. v. Voicestream Wireless Corp.*, No. CIV.A. 01-5754, 2002 WL 1917697, at *12 (E.D. Pa. Aug. 19, 2002) (declining to apply the single entity theory because it "has yet to be adopted in Pennsylvania"); *Ziegler v. Del. Cty. Daily Times*, 128 F. Supp. 2d 790, 794–96 (E.D. Pa. 2001) (analogizing to the single entity theory to determine "whether [the defendant] was [the plaintiff's] employer for purposes of liability under the ADEA or PHRA"); *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio*, LLC, 846 A.2d 1264, 1278 & n.9, 1281 (Pa. Super. Ct. 2004) (observing that the single entity theory has not yet been adopted in Pennsylvania and affirming the trial court's decision against veil piercing on different grounds). *But see LMcD*, 405 B.R. at 564–66 (concluding that the Pennsylvania Supreme Court would likely adopt the single entity theory under certain limited circumstances in order to prevent fraud or injustice, but finding that "the Trustee has failed to satisfy all [of its] elements").

By way of background, the elements of the single entity theory include an "identity of ownership, unified administrative control, similar or supplementary business functions, involuntary creditors, and insolvency of the corporation against which the claim lies." *Miners*, 722 A.2d at 695 (citing E. Latty, *Subsidiaries and Affiliated Corporations* § 7, at 5–40 (1936)). The single entity theory applies "where two or more corporations share common ownership and are, in reality, operating as a *corporate combine*." *Id.* (emphasis added). Under the single entity theory, "for the separate identity of the corporate entities to be disregarded, 'it must be shown that [one] is so controlled and its affairs so conducted that it is a *mere instrumentality* of another.'"[34] *LMcD*, 405 B.R. at 565 (emphasis added) (quoting *Main Bank of Chi. v. Baker*, 427 N.E.2d 94, 102 (Ill. 1981)).

Here, the Trustee alleges that the Debtor:

(1) "share[s] a unity of ownership" with WeVeel and Junto because DiPalma and Recchia were shareholders of the Debtor and own membership interests in WeVeel and Junto;

(2) "share[s] a unified administrative control" with WeVeel and Junto because DiPalma and Recchia were officers of all three entities;

(3) "share[s] a similar or supplementary business function" with WeVeel and Junto because each operates a former division of the Debtor;

(4) is indebted to several involuntary creditors, as such creditors "were not able to inspect the financial structure of [the Debtor] and discover potential risks of loss before entering into a transaction with [the Debtor]"; and

(5) was insolvent when DiPalma and Recchia transferred the Debtor's Assets to WeVeel and Junto.

---

[34] The single entity theory has been compared to "triangular piercing," whereby one entity's liabilities are imposed first upon its shareholders through veil piercing and then upon a commonly owned corporation through "reverse piercing." *LMcD*, 405 B.R. at 565; *see also Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F. Supp. 835, 840 n.12 (E.D. Ark. 1996) (explaining that in triangular piercing, the two entities are related, but independent "sister corporations" that share a "parent shareholder"), *aff'd*, 112 F.3d 513 (8th Cir. 1997).

Am. Compl. ¶¶ 261–65, 268–72. The Joint Defendants argue in response that the Debtor on one

hand, and WeVeel and Junto on the other, did not share identical ownership either at the time of

the transfers or at any point thereafter and that the single entity theory therefore does not apply

here. Second Joint Mot. 36 (citing *J.B. Hunt*, 2013 WL 3208586).

      The Joint Defendants are correct. According to the Amended Complaint, DiPalma owned

a 60% interest in the Debtor and Recchia and Stromberg each owned a 20% interest in the

Debtor. Am. Compl. ¶ 36. In contrast, in addition to DiPalma and Recchia, WeVeel is also

allegedly owned by Lane, Pecci, Chiapelli, and unidentified "others," and Junto is also allegedly

owned by Chiapelli, all in unspecified amounts. *Id.* ¶¶ 82, 91, 104. The Debtor therefore does not

share an identity of ownership with either WeVeel or Junto. *Cf. Miners*, 722 A.2d at 695

(concluding that no identity of ownership existed where, although 60% of each of two

corporations shared common ownership, the remaining 40% of each did not).

      Despite her failure to plead the first element of the single entity theory, the Trustee argues

that Pennsylvania "generally takes a 'flexible approach' to piercing the corporate veil" under

which the Court should consider the "totality of the circumstances." Resp. to Second Joint Mot.

54–55 (quoting *Macready*, 2011 WL 4835829, at *6). She argues that it may therefore be

appropriate to pierce the corporate veil under the single entity theory even if the elements of the

theory are not all met. *Id.* at 55 n.13 (citing *Bona Fide Demolition & Recovery, LLC v. Crosby

Constr. Co. of La.*, 690 F. Supp. 2d 435, 448 (E.D. La. 2010); *N. Am. Van Lines, Inc. v. Emmons*,

50 S.W.3d 103, 120 (Tex. App. 2001)).

      The flexible, totality of the circumstances approach advocated by the Trustee derives

from the Third Circuit's statements in *Plastipak Packaging, Inc. v. DePasquale*, 75 F. App'x 86

(3d Cir. 2003), that "[t]here is no definitive test for piercing the corporate veil" in Pennsylvania

- 64 -

and that courts may pierce the corporate veil "whenever necessary to avoid injustice." 75 F.

App'x at 88 (quoting *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super.

Ct. 1991); *Rinck v. Rinck*, 526 A.2d 1221, 1223 (Pa. Super. Ct. 1987)). Those statements,

however, pertained specifically to the alter ego theory, with respect to which the court articulated

numerous nonexclusive factors. *Id.*

The single entity theory, in contrast, sets forth a discrete list of factors that the Trustee

must plead in order to state a claim. Indeed, *Macready v. TCI Trans Commodities, A.G.*, Civ. A.

No. 00-4434, 2011 WL 4835829 (E.D. Pa. Oct. 12, 2011), which the Trustee cited in support of

the application of the totality of the circumstances approach, specifically <u>denied</u> recovery under

the single entity theory based upon the plaintiff's failure to prove just a single element thereof.

*See* 2011 WL 4835829, at *8 (denying recovery where the plaintiff failed to show that it was an

involuntary creditor of the defendant). Furthermore, the cases cited by the Trustee for the

proposition that she need not plead all of the elements of the single entity theory are

distinguishable. *See Bona Fide Demolition*, 690 F. Supp. 2d at 445, 448 (applying an eighteen-

factor test, which "provides no guidance as to the weight to be given [to] any of the eighteen

factors or whether any, all or some of the factors must be present"); *N. Am. Van Lines*, 50

S.W.3d at 119–20 (applying a test that "relies on equity analogies to partnership principles of

liability" and that "does not require proof of all the elements of a true joint venture or

partnership").

Finally, according to the Trustee, the Debtor "cease[d] all operations as a going concern"

as a result of the alleged transfers in November 2009. Am. Compl. ¶ 68(c). The Debtor was

therefore effectively defunct when DiPalma and Recchia began to use WeVeel and Junto as

"front[s]" through which they operated the Debtor's former toy and craft and graphic design

- 65 -

divisions. *See id.* ¶¶ 78, 82, 91 (alleging that DiPalma and Recchia acquired membership

interests in WeVeel and Junto in April 2010). Based on this timeline, it is implausible that the

Debtor comprised a "corporate combine" with WeVeel or Junto or was a "mere instrumentality"

of either such that WeVeel and Junto should be held liable for its debts under the single entity

theory. Based on the foregoing analysis, the Court therefore will dismiss Counts VI–VII of the

Amended Complaint to pierce the corporate veils of WeVeel and Junto.

G.    **Count VIII: Unjust Enrichment Claims Against All Defendants**

In Count VIII of the Amended Complaint, the Trustee asserts unjust enrichment claims

against the Defendants and IYA. Am. Compl. ¶¶ 274–77. Under Pennsylvania state law, the

terms "unjust enrichment" and "quantum meruit" are synonymous. *Goldsmith Assocs., Inc. v.*

*Del Frisco's Rest. Grp., LLC*, Civ. A. No. 09-1359, 2009 WL 3172752, at *2 (E.D. Pa. Oct. 1,

2009) (quoting *Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 667 (Pa.

Super. Ct. 2007)). "Unjust enrichment contemplates that '[a] person who has been unjustly

enriched at the expense of another must make restitution to the other.'"[35] *Wilson Area Sch. Dist.*

*v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006) (quoting *Binns v. First Nat'l Bank of California, Pa.*,

80 A.2d 768, 775 (Pa. 1951)). Unjust enrichment claims therefore arise under "neither contract

nor tort" law. *Powers v. Lycoming Engines*, 328 F. App'x 121, 126 (3d Cir. 2009) (quoting

Restatement (Second) of Conflict of Laws § 221 introductory note (Am. Law Inst. 1971)).

"'Unjust enrichment' is essentially an equitable doctrine." *Styer v. Hugo*, 619 A.2d 347,

350 (Pa. Super. Ct. 1993), *aff'd*, 637 A.2d 276 (Pa. 1994). The elements of a claim for unjust

enrichment are (1) the conferral of benefits upon the defendant by the plaintiff; (2) the

---

[35] The terms "unjust enrichment" and "restitution" may also "be treated as synonymous." Restatement (Third) of Restitution § 1 cmt. c (Am. Law Inst. 2011); *accord Powers v. Lycoming Engines*, 328 F. App'x 121, 126 (3d Cir. 2009).

acceptance and retention of such benefits by the defendant; and (3) circumstances under which

"it would be inequitable" if the defendant retained the benefits without compensating the

plaintiff. *Id.* (quoting *Wolf v. Wolf*, 514 A.2d 901 (Pa. Super. Ct. 1986), *overruled on other*

*grounds by Van Buskirk v. Van Buskirk*, 590 A.2d 4 (Pa. 1991)). In other words, "the party

against whom recovery is sought" must have "either wrongfully secured or passively received a

benefit that would be unconscionable for the party to retain without compensating the provider."

*Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (citing *Torchia* ex

rel. *Torchia v. Torchia*, 499 A.2d 581 (Pa. Super. Ct. 1985)).

To support an unjust enrichment claim, it is unnecessary to allege that the plaintiff

conferred benefits directly upon the defendant; the defendant may have benefited indirectly.

*Glob. Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008).

However, "[t]he doctrine does not apply simply because the defendant may have benefited as a

result of the actions of the plaintiff." *Styer*, 619 A.2d at 350 (citing *Meehan v. Cheltenham Twp.*,

189 A.2d 593 (Pa. 1963)). Rather, "the most significant element of the doctrine is whether the

enrichment of the defendant is *unjust*." *Id.* The focal point of the Court's analysis is therefore

"whether the defendant has been unjustly enriched," rather than the "intention of the parties."

*Com.* ex rel. *Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005)

(citing *Torchia*, 499 A.2d 581); *Styer*, 619 A.2d at 350. Whether the Amended Complaint states

a claim for unjust enrichment therefore "depends on the unique factual circumstances of [the]

case." *Id.* at 350.

The Trustee alleges that each of the Defendants received "a financial benefit" from the

Debtor as a result of DiPalma and Recchia's "stealing and taking personal possession" of the

Debtor's Assets and transferring the Assets to WeVeel and Junto in the spring of 2010. Am.

Compl. ¶ 275. The Trustee argues that "[t]he retention of said financial benefits by Defendants,

without payment to [the Debtor], would be unjust," therefore "[e]quity requires that Defendants

be disgorged of said unjustly received financial benefit[s]." *Id.* ¶¶ 276–77. The Joint Defendants

and Cra-Z-Art move to dismiss the Trustee's unjust enrichment claims. For the reasons stated

below, the Court will deny the Joint Defendants' motion and grant Cra-Z-Art's motion.

### 1.   The Joint Defendants

With respect to the Joint Defendants, the Trustee argues that they accepted and retained

benefits from the Debtor in the form of profits that they derived by operating the Debtor's former

toy and craft and graphic design divisions. Resp. to Second Joint Mot. 58; *see also* Am. Compl.

¶¶ 147, 165, 303, 305 (alleging, for example, that WeVeel derives "millions of dollars in profit"

by selling the Debtor's former "Snozberries" branded markers and that Junto derives "annual

profits in excess of $500,000" by providing graphic design services to Cra-Z-Art and IYA). The

Joint Defendants did not respond to these arguments.

The Trustee further argues that it would be "inequitable" if the Joint Defendants retained

such benefits and did not compensate the Debtor because they acquired the Debtor's former toy

and craft and graphic design divisions unlawfully. Resp. to Second Joint Mot. 58 (quoting *Glob.*

*Ground Support*, 581 F. Supp. 2d at 675). In response, the Joint Defendants argue that the

transfer of the Debtor's Assets is "imputed to [the Debtor]" who is therefore "deemed to have

participated in the transfer." Second Joint Mot. 38 (citing *Official Comm. of Unsecured Creditors*

*v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001)). Accordingly, the Joint Defendants

argue that the Trustee therefore "is barred from now bringing a claim for unjust enrichment"

pursuant to the affirmative defense of *in pari delicto*. *Id.* at 39. Alternatively, they argue that the

Trustee therefore "has not shown how the transfer . . . is unjust" and that the equitable remedy of

disgorgement is unavailable to the Debtor.[36] *Id.* As explained above, however, imputation is a

defense available only to third parties and therefore cannot be raised by DiPalma and Recchia.

Restatement (Third) of Agency § 5.04 cmt. b. (Am. Law Inst. 2006).

WeVeel, Junto, and Lane, in contrast, are third parties and imputation principles do

protect third parties "who transact business with a corporation." *Allegheny Health III*, 989 A.2d

313, 333 (Pa. 2010) (citing *Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 285–86 (Pa.

1985)). As explained above, in order for an agent's fraud to be imputed to his principal, the

agent's fraud must have, *inter alia*, occurred "in the course of his employment . . . . and *while*

*transacting corporate business*." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir.

2013) (emphasis added) (quoting *In re Pers. & Bus. Ins. Agency*, 334 F.3d 239, 242–43 (3d Cir.

2003)).

The Debtor's Assets were allegedly transferred to WeVeel and Junto *after* DiPalma and

Recchia transferred the Assets from the Debtor to themselves. *See* Am. Compl. ¶¶ 68, 82, 94

(stating that the transfers from the Debtor to DiPalma and Recchia occurred in November 2009

and that the transfers from DiPalma and Recchia to WeVeel and Junto occurred in the spring of

2010). Based on the Trustee's factual allegations, there is no reason to believe that, at the

moment of the subsequent transfers, DiPalma and Recchia still were acting on behalf of the

Debtor, which had "suddenly cease[d] all operations as a going concern" as a result of the

original transfers. *Id.* ¶ 68(c). Moreover, the Joint Defendants do not argue (and the Trustee does

not allege) that WeVeel, Junto, or Lane reasonably believed that DiPalma and Recchia were

---

[36] The Joint Defendants also argue that "the Amended Complaint fails to identify what items are alleged to have been transferred and the approximate value for such items," therefore they cannot form an adequate response to the Trustee's claim for unjust enrichment. Second Joint Reply 25. However, as explained above, the Amended Complaint's description of the Debtor's Assets and value exchanged therefor is sufficiently particular.

acting on behalf of the Debtor during the subsequent transfers. Therefore, neither WeVeel, Junto,

nor Lane allegedly transacted business with the Debtor and there is no basis upon which the

subsequent transfers may be imputed to the Debtor.

In any event, even if WeVeel, Junto, and Lane did transact business with the Debtor,

imputation principles would not apply here because such entities/individual allegedly engaged in

collusive conduct and imputation principles "justly operate to protect third parties on account of

their reliance on an agent's actual or apparent authority." *Allegheny Health III*, 989 A.2d at 336

(citing *Travelers Cas. & Sur. Co. v. Castegnaro*, 772 A.2d 456, 460 (Pa. 2001)). Imputation

principles therefore "do not (and should not) apply in circumstances in which the agent's

authority is neither actual nor apparent, as where both the agent and the third party know very

well that the agent's conduct goes unsanctioned by one or more of the tiers of corporate

governance." *Id.* For example, "secretive, collusive conduct between corporate agents and third

parties that [is] 'overwhelmingly adverse to the corporation'" may not be imputed to the

principal, "even if the collusion provided 'a peppercorn of benefit'" to the principal. *Official*

*Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v.*

*PriceWaterhouseCoopers, LLP*, 607 F.3d 346, 352 (3d Cir. 2010) (quoting *Allegheny Health III*,

989 A.2d at 334–35). "In such cases, 'the ordinary rationale supporting imputation breaks down

completely'" because "there can be no justifiable reliance on the agent's authority." *Id.* at 352–

53 (quoting *Allegheny Health III*, 989 A.2d at 336).

The Trustee plausibly alleges in the Amended Complaint that WeVeel, Junto, and Lane

"knew the existence of, history and purpose and the goals of the [alleged fraudulent scheme]; and

agreed, actually or impliedly, to join in concert with" DiPalma and Recchia to defraud the

Debtor. Am. Compl. ¶¶ 80, 92. Pursuant to the Trustee's allegations, WeVeel, Junto, and Lane

therefore did not rely on DiPalma and Recchia's actual or apparent authority as agents of the

Debtor in the context of the subsequent transfers. Rather, they colluded with DiPalma and

Recchia to the Debtor's detriment and the rationale supporting imputation is therefore absent.

For all of the foregoing reasons, the affirmative defense of *in pari delicto* finds no support on the

face of the Amended Complaint.

   The Joint Defendants did not rebut whether it would be unjust if they retained the profits

that they allegedly derived from the Debtor's former toy and craft and graphic design divisions

on any basis other than imputation. Their retention of the profits would be unjust, however, if the

profits were produced by property that "in good conscience" belonged to the Debtor. *See Great-*

*W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14, 214 n.2 (2002) (approving of "an

accounting for profits" as "a form of equitable restitution" under such circumstances). Here, the

Joint Defendants' alleged use of the Debtor's Assets, personally and proximately through

WeVeel and Junto, to produce profits was unauthorized by the Debtor, nor did any of the Joint

Defendants ever pay for the use of such assets. Accepting the Trustee's nonconclusory

allegations as true and making all reasonable inferences therefrom in her favor, it would be

unjust if the Joint Defendants retained such profits. "[A]ny lesser liability would provide an

inadequate incentive to lawful behavior." *See* Restatement (Third) of Restitution § 3 cmt. c (Am.

Law Inst. 2011) (stating that if a defendant made a "profitable, unauthorized use of the

claimant's property, then [paid] only the objective value of the assets taken or the harm inflicted,

the anomalous result would be to legitimate a kind of private eminent domain (in favor of a

wrongdoer)"). The Court therefore will deny the Joint Defendants' motion to dismiss the

Trustee's unjust enrichment claims.

2.    <u>Cra-Z-Art</u>

With respect to Cra-Z-Art, the Trustee first argues that it unjustly received the benefits

"of approximately $150,000 in receivables owed to [the Debtor] that were effectively and

unlawfully cancelled pursuant to Cra-Z-Art falsely informing Chesapeake Bank that the invoices

which memorialized the receivables (and which had been factored to Chesapeake Bank) were not

valid." Resp. to Second Cra-Z-Art Mot. 30; Am. Compl. ¶¶ 140, 142. Specifically, as explained

above, the Trustee alleges that Cra-Z-Art "falsely reported to Chesapeake . . . that $78,395 of the

invoices were not valid." Am. Compl. ¶ 146.

In response, Cra-Z-Art observes that, according to the Trustee's allegations, Chesapeake

paid the Debtor for the allegedly falsely canceled invoices pursuant to the Factoring Agreement.

Second Cra-Z-Art Mot. 19. Cra-Z-Art argues that any benefit that accrued to Cra-Z-Art as a

result of the cancelled invoices therefore "did not come at the expense of [the Debtor], and [the

Debtor] therefore has no standing to complain. In short, [the Debtor] has no right to be paid

twice, and therefore has no unjust enrichment claim against Cra-Z-Art." *Id.* Cra-Z-Art further

argues that to the extent that the canceled invoices benefited Cra-Z-Art at the Debtor's expense,

"each purchase order" underlying the invoices "was a contract," and the Trustee therefore

"cannot recover in quasi-contract, the equitable relief for unjust enrichment." *Id.* at 20.

Cra-Z-Art is correct that the Trustee's claim for unjust enrichment essentially seeks "a

quasi-contractual remedy in which a contract is implied-in-law" and "sounds in restitution."

*Hershey Foods*, 828 F.2d at 998 (quoting *Ragnar Benson, Inc. v. Bethel Mart Assocs.*, 454 A.2d

599, 603 (Pa. Super. Ct. 1982)) (citing *Overseas Dev. Disc. Corp.*, 686 F.2d at 510–11). A quasi-

contract "imposes a duty, not as a result of any agreement, whether express or implied, but in

spite of the absence of an agreement when one party receives an unjust enrichment at the

expense of another." *Id.* at 999 (quoting *Birchwood Lakes Cmty. Ass'n, Inc. v. Comis*, 442 A.2d 304, 308 (Pa. Super. Ct. 1982)).

Where a contract exists, the parties thereto "are not entitled to the remedies available under a judicially-imposed quasi[-]contract [i.e., the parties are not entitled to restitution based upon the doctrine of unjust enrichment] because the terms of their agreement (express and implied) define their respective rights, duties, and expectations." *Wilson Area Sch. Dist.*, 895 A.2d at 1254 (alteration in original) (quoting *Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614, 620–21 (E.D. Pa. 2003)). Only where "the terms of the contract do not address the compensation owed to a plaintiff for a particular benefit conferred on the defendant" will the plaintiff be entitled to restitution despite the existence of a contract between the parties. *Essex Ins. Co. v. RMJC, Inc.*, 306 F. App'x 749, 753–54 (3d Cir. 2009).

The Court agrees with Cra-Z-Art that the canceled invoices cannot provide a basis for the Trustee's unjust enrichment claims because of the underlying contracts, the existence of which the Debtor does not dispute. The Court presumes that the contracts between Cra-Z-Art and the Debtor address the compensation that Cra-Z-Art owed to the Debtor in return for the services that the Debtor provided to Cra-Z-Art. The Court also agrees with Cra-Z-Art that its alleged retention of the benefits of the canceled invoices is not unjust in light of the compensation that the Debtor received pursuant to the Factoring Agreement. The Court therefore concludes the canceled invoices do not support the Trustee's unjust enrichment claims against Cra-Z-Art.

The Trustee also argues Cra-Z-Art unjustly and "knowingly received property that was stolen from [the Debtor], or derived from property that had been stolen from [the Debtor]." Resp. to Second Cra-Z-Art Mot. 30; Am. Compl. ¶ 154. As explained above, the Trustee alleges that Cra-Z-Art purchased "approximately $60,000 to $70,000" of graphic design services per month

- 73 -

from DiPalma and Junto that were derived from the Debtor's copyrighted graphic design services, beginning in January 2010. Am. Compl. ¶¶ 142, 147, 149. The Trustee further alleges that "[t]here was no formal agreement between [the Debtor] and Cra-Z-Art" such that the Debtor "retained all of the rights to distribute, reuse or otherwise possess or enforce the copyright[s] beyond the single-use for which [they were] granted." *Id.* ¶¶ 151–52. Because DiPalma and Junto continued to provide Cra-Z-Art with the graphic design services that it formerly purchased from the Debtor, the Trustee alleges that Cra-Z-Art "avoid[ed] the cost and delay of having them recreated from scratch" by a new supplier without the original working files. *Id.* ¶ 298. The Trustee argues that the Debtor was therefore "entitled to payment every time Cra-Z-Art *used, or continues to use* products that were designed by [the Debtor]." *Id.* ¶ 299 (emphasis added).

In response, Cra-Z-Art argues that "[t]o the extent [it] is alleged to have received any benefit by, for example, receiving services from Junto, it paid for (and is not alleged not to have paid for) such services. These transactions are not alleged to be anything other than arms-length business transactions." Second Cra-Z-Art Mot. 18. Cra-Z-Art asserts that any benefit conferred upon it by the Debtor by virtue of the services Cra-Z-Art received from Junto was therefore "not unjustly confirmed." *Id.*

Cra-Z-Art is correct. The Trustee alleges that Cra-Z-Art paid DiPalma and Junto "for each use of the materials that had been exclusively developed by [the Debtor]"; that Cra-Z-Art conducts "approximately $60,000 to $70,000 in monthly business" with DiPalma and Junto; and that such business "fund[ed] the operation" of the alleged RICO Enterprise. Am. Compl. ¶¶ 147, 183(f), 290. The Court therefore concludes, and the Trustee did not dispute, that Cra-Z-Art provided reasonably equivalent value in exchange for the graphic design services that it purchased from DiPalma and Junto. In fact, on the face of the Amended Complaint, it appears

that Cra-Z-Art paid the same monthly amount for the services that it received from the Debtor

and, later, Junto. Cra-Z-Art therefore did not receive any discount or benefit by obtaining the

services from DiPalma or Junto as opposed to the Debtor; rather, it paid the fair market value for

the services. Based on the foregoing, it is impossible for the Court to conclude that Cra-Z-Art

was unjustly enriched. The Court therefore will grant the Cra-Z-Art Motion to Dismiss the

Trustee's unjust enrichment claims.

## IV.    CONCLUSION

For the foregoing reasons, the Joint Defendants' Motion to Dismiss the Amended Complaint is granted in part and denied in part and Cra-Z-Art's Motion to Dismiss the Amended Complaint is granted in its entirety. Specifically, the Court grants the Joint Defendants' Motion to Dismiss the following claims with prejudice: (1) the Count I RICO Claims against the Joint Defendants; (2) the Count VI Veil Piercing Claim against WeVeel; and (3) the Count VII Veil Piercing Claim against Junto. The Court denies the Joint Defendants' Motion to Dismiss the Amended Complaint with regard to (1) the Count II PUFTA Claims against DiPalma and Recchia; (2) the Count III Conversion Claims against DiPalma and Recchia; (3) the Count IV PUFTA Claim against WeVeel; (4) the Count V PUFTA Claim against Junto; and (5) the Count VIII Unjust Enrichment Claims against the Joint Defendants.

An appropriate order follows.

Date:    August 12, 2016

_____
Ashely M. Chan
United States Bankruptcy Judge